Alphonse LEWIS, Jr., Plaintiff-Appellee,

v.

CITY OF GRAND RAPIDS et al., Defendants-Appellants.

No. 15669.

United States Court of Appeals
Sixth Circuit.

Feb. 16, 1966.

Wendell A. Miles, Grand Rapids, Mich., for appellants, William J. Garlington, City Atty., Dutchess, Mika, Miles, Meyers & Snow, Grand Rapids, Mich., on brief.

George W. Crockett, Jr., Detroit, Mich., for appellee, Alphonse Lewis, Jr., Grand Rapids, Mich., Charles M. Waugh, James Kobza, Muskegon, Mich., on brief.

Before CECIL, O'SULLIVAN and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Appellants, City of Grand Rapids, Michigan, and its Chief of Police, William A. Johnson, challenge a judgment of the United States District Court which vacated an order of the Grand Rapids City Commission denying approval of the transfer of a Class C liquor license to plaintiff-appellee, Alphonse Lewis, and affirmatively ordered the Chief to recommend and the City to grant such approval. Under the Michigan Liquor Control Act, such approval was required before the Liquor Control Commission would effectuate the transfer. M.S.A. § 18.988, Comp.Laws Mich. 1948, § 436.-17. Roodvoets v. Anscer, 308 Mich. 360, 13 N.W.2d 850.

The District Judge held that the City Commission's action was the product of racial and other invidious discrimination and that plaintiff, a negro, was entitled to, and was denied, due process of law in the City's consideration of his application for such approval. After the desired approval was refused, and after a subsequent resolution of the Commission requesting the Liquor Control Commission to revoke the involved license, plaintiff brought this action in the United States District Court at Grand Rapids. His complaint charged deprivation of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, and asserted jurisdiction under pertinent civil rights sections of the Judicial Code.

We hold that the District Judge erred in his conclusion that consideration of the transfer application had to comply with traditional procedures of due process, viz., specification of grounds for refusal, presentation of evidence supporting such grounds, confrontation of witnesses with opportunity for cross-examination, and like procedures.

If racial bias or invidious discrimination motivated the actions of the City of Grand Rapids, or if denial of the transfer approval was the consequence of a conspiracy to deny plaintiff Lewis his civil rights, then such actions must be struck down as a denial of the Fourteenth Amendment's guarantee to plaintiff Lewis of equal protection of the law. Glicker v. Michigan Liquor Control Commission, 160 F.2d 96 (CA 6, 1947). Our review of the entire record of the case, however, leaves us with "the definite and firm conviction that a mistake has been committed" by the District Court findings in such regard. United States v. United States Gypsum Co., 333 U.S.

364, 395, 68 S.Ct. 525, 92 L.Ed. 746, 766 (1948). Fed.R.Civ.P. 52(a). We reverse the judgment of the District Court to the extent that it vacates the order of the City Commission denying the transfer and affirmatively orders approval thereof. The City's brief does not challenge the District Judge's finding of denial of due process in the revocation of the license. We, therefore, do not discuss that. McCraw v. United Ass'n of Journeymen & App. of Plumbing, etc., 341 F.2d 705 (C.A. 6, 1965).

Much of the troubled history of Barnett's Bar, a Class C liquor establishment of Grand Rapids, is set forth in the extensive opinion of the District Judge. Lewis v. City of Grand Rapids, 222 F. Supp. 349–396 (W.D.Mich.1963). The opinion contains the District Judge's subjective conclusions and factual inferences upon which he based his findings. The Chief of Police and six of the seven members of the City Commission of Grand Rapids were convicted of conspiring to invidiously discriminate against plaintiff Lewis, motivated, at least in part, because he was a Negro.

Plaintiff Lewis' relevant connection with Barnett's Bar began in early 1959. Mr. Lewis, an attorney, had represented Patricia Barnett while she was under guardianship during her minority. Her property at that time consisted principally of her interest in the estate of her deceased father, the former licensee of Barnett's Bar, who had also been a client of Mr. Lewis. By marriage, Patricia Barnett became Patricia Ettress, and later Patricia Bell. The Liquor Control Commission did not consider this then 23 year old girl qualified to operate the bar and an initial step in Mr. Lewis' service to his young client was the making, on May 20, 1959, of a contract which made him the manager of Barnett's Bar. This arrangement was approved by the police authorities of Grand Rapids and was apparently required by the Liquor Control Commission as a condition to restoration of the license which had been suspended because of previous defaults. By this contract, plaintiff Lewis was to act as Mrs. Ettress' attorney as well as manager of her bar. He was given broad powers to sign all needed documents, and otherwise to exercise full control over the operation of the bar, including the right to hire and fire all of its employees. Lewis was to paid 6% of the bar's gross sales for the first year of his employment and 10% for the second and any subsequent term of the contract, with a guaranteed annual minimum compensation of $2,000.00. The contract further provided that Lewis was to be "the agent and attorney in fact" for his client. The record is unclear as to the amount of time Mr. Lewis spent at the bar in performance of his managerial duties. During the time of his management there were several defaults in payment of federal and state taxes, although it appears that Mr. Lewis cured at least one of such defaults with a loan from his own funds. One or more of such defaults brought about so-called "stop" orders to prevent the continued operation of the bar. During this period Lewis obtained a chattel mortgage on the bar equipment to secure advances made to Mrs. Ettress.

In August of 1960, as the consequence of a police investigation at the Barnett Bar premises, a complaint was filed with the Liquor Control Commission and with a Judge of the Police Court of Grand Rapids that the persons named therein were carrying on "the numbers game." Arrests of several persons were made. Mr. Lewis acted as attorney for those arrested and ultimately all charges were withdrawn or dismissed except as to one accused who pleaded guilty on October 2, 1961, to the unlawful possession of policy or pool tickets "at 58–60 Ionia Avenue, S.W."—the building where the bar was located.

On November 15, 1960, Patricia Ettress agreed to sell her license and business to one Dr. Cortez English for $18,000.00. In May of 1961, Lewis amended the English agreement to add himself as a purchaser with Dr. English. In April of 1961 Lewis had acquired a contract purchaser's interest in the building in which Barnett's Bar was located.

The sellers had acquired their title from Patricia Ettress' stepmother. The contract of purchase in which Lewis acquired an interest was in the names of his sisters. Following the making of the contract under which Mr. Lewis was to join in buying out his client, there began the steps to get the needed approval of a transfer of the license to plaintiff Lewis and Dr. English.

During 1961 and into 1962, Mrs. Ettress at various times expressed her dissatisfaction with Mr. Lewis' conduct and with his plan to acquire her license. On several occasions she wrote to the Liquor Control Commission, withdrawing her consent to a transfer. On May 10, 1961, she wrote to Lewis expressing her desire to terminate the management contract, stating "you are unable to take care of my affairs * * * because of conflicting interest." On October 21, 1961, following two and one-half years of Lewis' management of the bar, Mrs. Ettress reported to the Liquor Control Commission that her bar business was then under padlock for failure to satisfy Federal tax liens and that her license was then in the hands of the Internal Revenue Service; that her only out "now as before" was to sell her business to pay her debts. She asked that the pending application for transfer be withdrawn "because of some things that have happened since that application was sent in originally with only Dr. Cortez English as the buyer, before he requested that attorney Alphonse Lewis, Jr., be named as a partner." Her letter proceeds,

"He has been the manager of the before mentioned Barnett's Bar and also my attorney and financier on many occasions. I had repeatedly asked him for a final accounting and he gave it to me this summer after I was all ready committed to sell it to him. But, in a nut shell it goes as follows, for managers fees from May 21, 1959 to May 21, 1961, 6% of the gross income for the first year and 10% of the gross income for the second year. Which came to $8,406.78. I of course had never

been in business before and that was why the Commission requested that I have a manager at the time and also because I was only twenty-three at the time. Then also he wasn't what is refered to as a working manager because he is a attorney by profession law. So of course there were times when he didn't even come near the business few days at a time. He also billed me for miscellaneous legal fees which came to $2609.50. I felt that some of these came under management. In loans from him the amount comes to $6079.87, with 6% interest added in of course. The latter of which I'm more than willing to pay back to him and I have no doubt in my mind that I owe him for what I borrowed from him. The grand total of this is $17,096.15. The sale that I mentioned before was for only $18,000. As you can see this leaves me with the problem of paying my other obligations, which I couldn't pay for in a life time as I couldn't possibly earn enough on a job to pay them.

* * *

"I'm sending you a copy of a agreement that Mr. Lewis gave me to be considered and signed by me in lieu of a loan of $800.00 more to be paid by him to the Internal Revenue office to release the padlock. We had tried a situation similar to this and instead of his paying the tax he was in Lasing at some kind of a hearing with your Mr. Ressi to reconsider his application. He had however been in charge of the money because he had loaned me money to avoid closing for sales tax and I thought perhaps the whole business would be cleared up before this situation would have to be continued for long as it was not agreeable to me.

"He had however gotten money from the bar to pay these taxes to a degree that would have satisfied Mr. Farrell. Instead the bar was padlocked and that is how things stand at the present time. He paid some of the

obligations of the bar and kept the rest for his bill or against his bill I should say and he wouldn't even give me the money as I had none to live on because I had been home sick."

On December 19, 1961, Mrs. Ettress wrote the Commission "that the application for transfer of my license to Mr. Lewis and Mr. English is hereby cancelled."

Tax defaults were chronic during the upwards of three years of Mr. Lewis' management and it appears that for such entire period the personal property taxes due the City of Grand Rapids went unpaid. Additional circumstances preventing a license transfer were the long pending gambling charges. It was a policy of the Liquor Control Commission not to complete a transfer of a liquor license while violation charges remained outstanding. The long and confused route of the charges against the bar is set out in the District Judge's opinion, 222 F.Supp. at pages 353–355. From August, 1960, when some four or five men were arrested in a raid at the bar premises, until October 2, 1961, some charges remained pending. All of those charged were represented by Mr. Lewis. Two of those were dismissed on examination, two more had their cases nolle prossed, and one entered a plea of guilty to the possession of gambling paraphernalia "at 58–60 Ionia Avenue"—the address of the building where the bar was located. The District Judge found that this charge did not involve the bar itself, but we are unable to clearly understand how this conclusion was arrived at. Following the above dispositions, the Liquor Control Commission on October 31, 1961, concluded its own investigation of the gambling charges. Its report concluded that "there is no doubt * * * that there has been some gambling operations in your bar with the knowledge of your bartender." The examining officer dismissed the charges with the observation that he "was glad you're [Mrs. Ettress] going out of the business and I understand that you're [Lewis] going on * * *. I'm sure you'll [Lewis] be able

to curtail the activities." All of the foregoing, however, occurred during Lewis' management. He appeared, however, to cast the blame for any irregularities upon his client, Mrs. Ettress.

While the end of the gambling charges came, tax difficulties were continuing. Appellee Lewis recites transactions which eventuated in his acquiring his client's interest in the bar fixtures,

"In August of 1961 the sales tax man and the state police came to close her up, and after a half day conference they agreed if she turned over financial control of the bar to me, if I kept track of the money that came in from the bar and paid the sales taxes, that they would let her continue to operate, in addition also upon my paying $500 to them immediately and paying the sales tax weekly.

"Thereupon, this was communicated to Mr. Farell of the Internal Revenue, and at that time Mr. Farell had demanded that she come up with certain amounts of money. I had some money at that time and offered to pay it to Mr. Farell, if Mrs. Ettress would be sure that she didn't dissipate any more of the money. I could never get a firm agreement out of her, to my satisfaction, and so I did not pay Mr. Farell that particular money, and Mr. Farell was kept aware, of course, of the money as it was accumulated. Then he closed the bar, as indicated here before."

On November 13, 1961, the Internal Revenue agent sold the bar fixtures at auction and Lewis bought them in for $50.00. The $50.00 paid did not satisfy the Internal Revenue taxes and the bar remained closed from September 21, 1961, until April 6, 1962. Lewis asserts that by such purchase he acquired for himself his client's equity in the bar equipment over and above Lewis' chattel mortgage. He testified:

"Q. * * * You purchased certain property from the Internal Revenue

Service on auction sale on November 13, 1961, is that correct?

"A. Correct.

"Q. What price did you pay?

"A. $50.00. Now, that was also the second auction. The original auction went for $1,400.00 and the person couldn't pay for it. * * *.

"Q. What did you purchase on that auction?

"A. It was the equity * * * the equity of redemption of Mrs. Ettress over and above the chattel mortgage which I then held on all the bar equipment."

The complaint in this case alleges that the Internal Revenue Service "sold all the right, title and interest of Patricia Ettress at public sale * * * to *plaintiff* (Lewis)." We do not find that Lewis has ever announced or considered that the title he then acquired was to protect or as trustee for his client. In December, 1961, Patricia Ettress wrote to the Liquor Control Commission that she considered the application for transfer to Lewis and Dr. English void. On December 14, 1961, she made a sworn statement to a Grand Rapids Police Lieutenant that she would not go through with a sale to Lewis and English, saying, "I don't want to transfer it to them simply for credit for Mr. Lewis' bills." The confusion existing in these months is set forth in the District Judge's opinion at 222 F.Supp. 356–358.

Mrs. Ettress' recalcitrance was met by a lawsuit filed on December 21, 1961, in the State Circuit Court at Grand Rapids, whereby Mr. Lewis sought to specifically enforce the agreement that his client had made with Dr. English and to which he had become a party. His complaint asked that he be appointed receiver of Barnett's Bar. This was refused. Lewis' application for transfer continued undetermined into 1962. The Safety Committee of the Grand Rapids City Commission which was considering the request for transfer to Lewis and Dr. English, undertook to study Lewis' lawsuit against his client, the transferor. On March 20,

1962, an agreement settling the lawsuit was entered into. By it, Lewis and Dr. English agreed that in addition to the $18,000 originally agreed upon they would assume and pay an additional $7,300 of Mrs. Ettress' debts. This agreement was subject to approval of the transfer of the license. See appendix to the District Court opinion at 222 F.Supp. 391.

The agreement of November 15, 1960, with Dr. English, was drafted and concluded in Lewis' office. There is nothing in the evidence to indicate that Dr. English was otherwise than Lewis' client. The sale price of $18,000 was originally to be paid in cash. It was not then geared to what Lewis' client then owed, or would owe to him for advances and services. It was after Lewis was added as a purchaser that he rendered a statement to his client totalling slightly more than $17,000. This amount was made up of loans at 6% interest amounting to about $6,000, and Lewis' fees as manager and attorney in the amount of about $11,000. With the addition of $1,920 that Mrs. Ettress owed to Dr. English, the arrangement would leave her still owing a balance to Lewis and Dr. English. There is no evidence that in the making of this deal Mrs. Ettress had any other advisor than her attorney and manager, Mr. Lewis. In May, 1961, the price was $18,000. When she was sued for performance of that agreement by her own lawyer, Mrs. Ettress obtained new counsel. When this litigation was presumably settled in March of 1962, about $7,300 was added to the purchase price by way of assuming additional debts of Mrs. Ettress.

Among faults charged to the City Commission by the District Judge was failure to detail to Lewis its reasons for not approving him. He found as a fact that the Commission had not, prior to the revocation proceedings, made specification to Lewis of the reasons which prompted its actions. It does appear that no formal enumeration of the reasons for denial was provided. But, whether formally notified or not, during consideration of the transfer Lewis was aware of the things

which, at the trial of this case, were identified as the causes of his being disapproved. He knew about the tax defaults and the closing of the bar therefor. He testified that he told the Safety Committee that the taxes would be paid if he was approved as a transferee. This conditional promise was not a substitute for discharge of an obligation assumed when he was given the exclusive financial control of the business. Placing the blame on his client was not an answer; neither was his intimation that his client and a boy friend were taking large sums of money from the enterprise. He knew about the gambling charges. He was the lawyer for all persons involved. He knew about his own relations with his young client, to whom he stood in a position of high trust. He knew that this fiduciary relationship ended in his suit to require her to convey to him the asset which he had been managing for upwards of two years. He knew of her complaints about his management and her "on again, off again" attitude toward transferring her license to him. The Grand Rapids authorities learned of these things in the course of their numerous hearings on the transfer application.

Members of the City Commission testified that the City Attorney had advised them that it was not necessary to specify to applicants reasons for denying a transfer, that embarrassment of such applicants was thus avoided. It seems clear that during the Safety Committee hearings the standing of Mr. Lewis as an acceptable transferee of the license for Barnett's Bar was deteriorating. We are of the view that considering the discretion vested in a City Commission in the matter of transfers of liquor licenses, the City Commission had ample ground for finding Mr. Lewis unacceptable.

Applications for transfer of liquor licenses are first referred for consideration and recommendation to a Safety Committee made up of three members of the Grand Rapids City Commission. The latter is the elected governing body of the city and consists of seven members who serve part time, meeting regularly once a week. The Chief of Police submits a Liquor Control Commission form (LCC 1800) giving his recommendation as to transfers. This is considered, but not necessarily controlling. It had not been the practice of the Safety Committee to hold formal hearings, with the taking of testimony and like procedures.

Hearings of the Safety Committee to consider Lewis' application extended over a period from January 16, 1962, to July 31, 1962, at which latter date his application was denied. At the January 16 hearing, Lewis was present and spoke for himself and Dr. English. The matter was then tabled to allow Commissioner Sevensma, a lawyer, to review plaintiff Lewis' then pending suit against his client in the Circuit Court of Kent County, Michigan. Through this investigation, the Safety Committee learned of the character and issues involved in the litigation between Lewis and his erstwhile client, and then unwilling transferor. The above-detailed settlement of the lawsuit was made on March 20, 1962, and was conditioned upon approval of a license transfer to Dr. English and plaintiff Lewis.

On April 17, 1962, the Safety Committee again took up the matter. Lewis was present. At this meeting, the Grand Rapids Chief of Police, William A. Johnson, presented a letter dated April 12, 1962, from the United States Internal Revenue Service requesting that a "Stop Order" be placed against a transfer of the license to Lewis. This letter was signed by revenue agent Gordon F. Forell.[1] An earlier letter, dated April 6,

1. The letter, addressed to the "Superintendent of Police," read:
    "It has been brought to the attention of this office that Mr. Alphonse Lewis, Jr., Attorney at Law, Grand Rapids, Michigan, has applied for the transfer of the Liquor License held by Patricia Ettress, DBA Barnett Bar, 60 Ionia Ave. S.W., Grand Rapids, Michigan.
    "For your information, Patricia Ettress is indebted to the Federal Government for past due Federal taxes for which

1962, had been written by the Liquor Control Commission expressing the Commission's understanding that "This has been a complex matter which we hope has now been satisfactorily clarified. We understand the violations and tax difficulties have all been resolved." The Safety Committee's desire to have reconciled this apparent conflict between the Liquor Control Commission's April 6 statement that tax difficulties had been settled and the Internal Revenue letter requesting a "Stop Order" for failure to pay federal taxes is emphasized by the District Judge as indicative of bad faith in the Safety Committee's delay in approving the transfer. Lewis contends, and the District Judge agrees, that the Chief of Police solicited the Internal Revenue letter as a means of thwarting Lewis. The Chief's denial of soliciting the letter and his attempt to explain its origin was cut off by the sustaining of a Lewis objection.[2] The charge of solicitation finds its principal support in plaintiff Lewis' hearsay statement that he had heard that such was the case. In all events, we find no impropriety in the Chief's presentation of the letter, especially in view of the chronic tax delinquencies of the bar under Lewis' management. Whether solicited or not, the factual correctness of the Farell letter is not questioned, viz.: that notices of federal tax liens had been recorded; that a "Stop Order" on the transfer *had been placed* with the Liquor Control Commission; and that the Internal Revenue Service desired similar action by the City of Grand Rapids. The record does indicate that Chief Johnson was developing a view that Lewis was not a desirable licensee for this bar. In addition to the tax de-

linquencies, the Chief considered that the charged operation of the numbers game at the bar, and Lewis' conduct in handling his client's affairs, lessened his attractiveness as a licensee.

Between the April 17 and the July 24, 1962 meetings, investigation by the Liquor Control Commission continued; the agent in charge reported difficulty in contacting Lewis, and Lewis then indicated that he was not in a hurry to have the investigation concluded. On July 24, 1962, a hearing was held before the Safety Committee with Lewis, Dr. English, Mrs. Ettress, and her then attorney present. Mrs. Ettress was then agreeable to a transfer to Lewis and Dr. English. There is dispute as to what was said and done at the meeting, but seemingly all present had an opportunity to express themselves. This meeting concluded with a carried motion that the matter be tabled for three weeks. At the trial of this case, Lewis and the city officials expressed differing understandings of the import of tabling the matter. Lewis stated that he assumed a further hearing would be held in three weeks. Safety Committee members considered that the hearing was concluded and that the tabling was merely for the purpose of allowing the Committee to consider its decision, and to obtain some further information from the Liquor Control Commission.

In all events, at the next regular meeting of the Safety Committee, July 31, 1962, the matter was taken from the table by unanimous vote, and denial of the transfer recommended. Lewis was not present nor given notice that such meeting was to consider his application. The reason given for acting without waiting

Notices of Lien have been filed with the Register of Deeds, Kent County, Michigan.

"A 'Stop Order' has been placed on the transfer of this license with the Michigan Liquor Control Commission asking for their cooperation in holding up any transfer until the Government's obligation is satisfied.

"If at all possible, this office would like a similar order be made a part of

your file in the matter of the transfer of the license to Mr. Lewis."

2. "Mr. Forell came into my office with Captain Szumski, explained the tax difficulties that they had had with this establishment, *informed me he placed a 'Stop' order with the Michigan Liquor Control Commission,* and seemed to be quite concerned that * * *" (Here an objection was sustained on the ground of hearsay)

the three weeks was concern that contemplated vacations of committee members might prevent early action. On the same day, at the regular meeting of the City Commission, the Safety Committee's recommendation was unanimously approved by the six members then present. The Chairman of the Safety Committee in reporting to the Commission, convened as a Committee of the Whole, gave as reasons for denial of the transfer the tax situation, Lewis' dual capacity "as manager, advisor and counselor" and the "poor operation" of the bar under his management. These reasons, however, were not made a part of the formal motion by which the Commission adopted the Safety Committee's recommendation.

The affairs of Barnett's Bar deteriorated further following the denial of the transfer to Lewis. Mrs. Ettress, the licensee, had moved to Flint, Michigan. She had, on March 20, 1962, executed an assignment of her license to Lewis and Dr. English. On September 10, 1962, she filed a voluntary petition in bankruptcy. The license for the Barnett Bar was the principal asset of the bankrupt estate. A contest arose between Lewis and the trustee in bankruptcy as to its ownership. Lewis contended that as assignee of the bankrupt he was the owner. The referee held that the trustee was the owner. Thereafter, on October 2, 1962, the City Commission of Grand Rapids initiated steps which culminated on November 20, 1961, in a resolution requesting the Michigan Liquor Control Commission to revoke the license of the Barnett Bar.

Because the District Judge's vacation of such request for revocation is not here involved we need not give detailed recital of relevant events. Under advice of the City Attorney, and because the Michigan statute, M.S.A. § 18.988, requires that a request to the LCC for revocation be preceded by "due notice and proper hearing," the City Commission attempted to set up and hold a hearing that would comply with due process. The several hearings antecedent to the final resolution, held on October 16 and 24 and on November 7 and 13, created excitement and confusion. There is no doubt that by this time opposition to and possibly dislike of Mr. Lewis had developed and there was evidence of remarks expressive of an intention to resist his efforts to take over Barnett's Bar. On November 13, by unanimous vote of 7 to 0, the City Commission requested that the license be revoked "unless the same is placed in escrow with the Michigan Liquor Control Commission prior to November 20, 1962." [3] The license not having been placed in escrow prior to November 20, the Commission, on that date, requested unconditional revocation of the license. The Mayor of Grand Rapids cast a dissenting vote to such request. Except for this, all previous actions by the City Commission involving the Barnett Bar license had been by unanimous vote. On November 19, 1962, the complaint in the case at bar was started.

Before setting out the reasons which prompt our decision, we should give this broad summary of the case. The relevant and troubled history of the Barnett Bar began in May, 1959, when Lewis took over its management for his client, and ended in his client's bankruptcy in September, 1962, at a time when he claims to have become the part owner of the bar premises, had upon foreclosure acquired the bar's fixtures, and had obtained an assignment of its license. Although by broad inference Lewis attributes some of the trouble to "dipping into the till" by his client and her boy friend, it is neither claimed nor proved that action by the police or other municipal officers of Grand Rapids had anything to do with Lewis' inability to discharge his fiduciary responsibilities so as to maintain his client's asset as a solvent and going enterprise. The only solution proposed was a sale of the business to him.

3. Under Michigan practice, where an underlying business has been interrupted or suspended, its license may be held "in escrow" awaiting its transfer to a new location or owner. The bankruptcy trustee was agreeable to such escrow, but Lewis was not.

We come then to the reasons which prompt us to hold first that in the proceedings prior to denial of the transfer to Lewis the due process clause of the United States Constitution did not require the City Commission to afford plaintiff Lewis a trial-type hearing, with formal specification of reasons for finding Lewis unacceptable, with confrontation of witnesses, with the taking and recording of testimony and with other formalities that customarily attend a full dress adversary proceeding; and, second, that plaintiff Lewis was not in relation to the transfer denied the equal protection of the law guaranteed him by the Fourteenth Amendment.

## I. *Due Process.*

■ Dealing with the law of Michigan, the liquor business has always been recognized as possessing a character vesting in public authorities a broad discretion in the control and regulation of it. Sherlock v. Stuart, 96 Mich. 193, 55 N.W. 845, 21 L.R.A. 580 (1895); Johnson v. Liquor Control Commission, 266 Mich. 682, 254 N.W. 557 (1934); Scott v. Arcada Township Bd., 268 Mich. 170, 255 N.W. 752 (1934); McCarthy v. Thomas Township Bd., 324 Mich. 293, 36 N.W.2d 923 (1949); People v. Wheeler, 185 Mich. 164, 171, 151 N.W. 710 (1915); Gamble v. Liquor Control Commission, 323 Mich. 576, 578, 36 N.W.2d 297 (1949); People v. Schafran, 168 Mich. 324, 330, 134 N.W. 29 (1912); Case v. Liquor Control Commission, 314 Mich. 632, 643, 23 N.W. 2d 109 (1946).

■ Scott v. Arcada Township, supra, emphasized the difference between the granting of a license and its revocation, indicating that revocation might indeed require due process. Although in Johnson v. Liquor Control Commission, supra, 266 Mich. 687, 254 N.W. 557, the Michigan Supreme Court said "[a] license [liquor] is not property within the meaning of * * * due process," we need not consider the point, because plaintiff Lew-

is was not a licensee and could become such only upon approval of the transfer to him of the Ettress license. Section 17 of the Michigan Liquor Control Act, M.S.A. § 18.988, requires as a condition to issuance of a license, that the application therefor "shall be approved by the local legislative body." Application to become a licensee by transfer must have like approval. Roodvoets v. Anscer, 308 Mich. 360, 363, 364, 131 N.W.2d 850 (1944).

On this due process question, we need not accept or rely on Hanson v. Romeo Village Council, 339 Mich. 612, 615, 64 N.W.2d 570, 571 which, relevant to the discretionary action of a local legislative body, said "[e]ven though exercised in an arbitrary and capricious manner, we do not review it." We hold only that neither the Fifth nor Fourteenth Amendment to the United States Constitution required that the Grand Rapids City Commission hold a full "due process" hearing to consider plaintiff Lewis' request for the transfer to him of a license then owned by another.

The Michigan legislature recognized a difference between issuance of a new license and revocation of an existing one. While Section 17 of the Act, M.S.A. § 18.988, originally provided that upon request of a local legislative body, "the commission shall revoke the license of any licensee," such section was amended in 1957 to provide that a request for revocation was to be made "after *due notice* and *proper hearing* by the body." (Emphasis supplied.) Such requirement, however, was not made applicable to approval of the transfer of a license.

It is not necessary that we express agreement with the holding that "[a] license is not property within the meaning of the due process clause." Johnson v. Liquor Control Commission, 266 Mich. 682, 687, 254 N.W. 557, 559. Plaintiff Lewis did not own a license to operate a liquor establishment, and the opportunity to seek approval to become an owner

was not, in our view, a property right.[4] Such holding is consonant with our decision in Glicker v. Michigan Liquor Control Com'n., 160 F.2d 96 (CA 6, 1947) where we said that "The right to a license to sell intoxicating liquor is not a natural or fundamental right, nor a privilege incident to national citizenship." Michigan's view that the character of the liquor business permits greater latitude in the means of its regulation than in the controls applied to other activities was paralleled by the United States Supreme Court in Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620 (1890). The Court there said,

> "There is no inherent right in a citizen to thus sell intoxicating liquors by retail. It is not a privilege of a citizen of the state or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The manner and extent of regulation rest in the discretion of the governing authority. That authority may vest in such officers as it may deem proper the power of passing upon applications for permission to carry it on, and to issue licenses for that purpose."

Although the *Crowley* case on its face appeared to hold that liquor licensing was even outside of the equal protection clause, this was not necessary to the decision, since, as the Court noted, the city in its return had alleged certain criminal violations, which, while never raised at a hearing (there having been none) " * * were a sufficient indication of the character of the place in which the business was conducted for the exercise of the discretion of the police commissioners in refusing a further license to the petitioner." The only inescapable rule of *Crowley* is that the denial of a hearing, in it-

self, would not violate the Fourteenth Amendment. Such a position is entirely consistent with the decisions of this Court in the instant case and in Glicker v. Michigan Liquor Control Commission, supra.

Indeed the District Judge here recognized the rules we speak of when he said,

> "We recognize that the Michigan Supreme Court and the courts of the other states have held consistently that the due process clause of the United States Constitution does not apply to matters concerning liquor licenses." 222 F.Supp. 384

Such observation conforms to the great weight of authority. Anno. 35 A.L.R.2d 1067. We, however, read his opinion as holding that all such decisions are now in conflict with today's view of the reach of the Fourteenth Amendment.

The United States Supreme Court, in recent decisions, has been exacting in its requirement of due process before a state agency may deny entrance of citizens into the practice of a profession or other calling, such as the practice of law, Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Willner v. Committee on Character and Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1962). None of these decisions, however, can be read to control the case of an application for transfer of a liquor license. The traditional municipal interests in regulating the liquor business, together with the problems of conducting this regulation through competent, civic-minded, part-time officials, require the use of flexible procedures. These exigencies of city management must not be disregarded by ordering that plaintiff Lewis, and everyone else wishing to become a transferee of a liquor license, receive a process including " * * * *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some set-

---

4. Instructions to applicants for a license transfer carry the large block letter legend "Do not invest any money or commit yourself by any binding agreement in the expectation of receiving a license until you are officially notified of the approval."

tled course of judicial proceedings." Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). While we hold that such kind of due process did not have to precede the denial of the transfer to Lewis, the evidence makes clear that he was given repeated hearings with opportunity to present and argue his own position. The things which made him unacceptable as a transferee—the tax delinquencies and the closing of the bar—the history of gambling—a generally poor operation under his management—and his relations with his client, highlighted by his lawsuit against her —were known to him and to the Commission. Although not set in a formal charge, they were the subject of much discussion.[5]

5. These excerpts from the Safety Committee members give an idea of what went on.

Commissioner Jamo described Lewis' conduct: "We never seemed to get to the meat. We always went round and round. You were there and we figured today you are going to bring up your testimony and we will get this resolved. You never seemed to touch on the point we were talking about."

Commissioner Lamberts testified to discussions, in Lewis' presence, at the Safety Committee hearings and which exhibited Lewis' attitude toward his own responsibilities: "On some occasions he would say that he was not—he had no responsibility for the fact that the bar was losing money, the fact that the taxes were not paid, the fact that a gambling operation had been going on in that bar. He had no responsibility for the things that went wrong."

"Q. And was there discussion then among the Committee members with and in the presence of Mr. Lewis with reference to what his responsbilities in the bar were and had been?

"A. Yes. We discussed that with him. We talked about the taxes, I think, at every meeting in which he was in attendance. He said he acquired the personal property through a tax sale for $50.00 * * *. So he said he owned the personal property. The personal property taxes had not been paid * * * since the bar had opened in '59. The sales taxes he said were her responsibility and the income taxes were her responsibility * * *. We discussed that he was the manager and he declared he had no responsibility to see that * * * any of the taxes were paid.

"Q. * * * With reference to gambling, what discussion, if any, was there with reference to it?

"A. Lewis said that one of the excuses that the Chief gave for holding up the approval of his license was that there was a violation pending relative to gambling."

Commissioner Barto testified concerning the involved Safety Committee meetings: "Lewis was recognized and heard repeatedly and allowed to make statements with reference to his position on any and all matters that were brought up."

Commissioner Vandenberg, talking of the July 24, 1962, meeting of the Safety Committee and of the fact that Lewis was given, and used, opportunity to speak, said: "Mr. Lewis had voluminous documents with him. He referred to these documents frequently and I think Mr. Lewis had a long time in which to present his position."

Commissioner Sevensma testified to talking to Lewis between meetings of the Safety Committee: "I had asked you [Lewis] some time after the January 16th meeting * * * I said, 'This is a very involved matter and has many complications and I would advise you, Mr. Lewis, that you should sit down and write in plain Anglo-Saxon words an exact and detailed chronology of what had happened in the case, beginning at the beginning and right up through the time when the Safety Committee was considering the matter.' However, you [Lewis] chose not to do so."

Commissioner Sevensma's testimony that Lewis' lawsuit with his client was disclosed at the January 16, 1962, meeting and that adjournment was had to allow investigation of the case, is agreed to by Lewis. Sevensma testified to what he found from examining the Circuit Court file,

"Mr. Lewis indicated on January 16, 1962, that he was then and had been for sometime the manager of this bar; that he had a management agreement with Patricia Ettress and also that he was her attorney.

"So in examining the Circuit Court record, I was particularly interested in seeing what allegations were made in reference to what I deemed to be a supposedly conflict of interest that he had, where on the one hand he was the manager and

Lewis contended that a plea of guilty to possession of gambling equipment at "58–60 Ionia Ave." was not proof that Barnett's Bar, located in the building carrying such address, was the site of, or involved in, the "numbers" enterprise. Except for that, neither at any hearing before the Safety Committee, at any of the revocation hearings or at the trial of the case at bar did Lewis make substantial contest of the underlying truth of the events detailed herein and which prompted the Commission's disapproval of him as a transferee. Whatever explanations he offered at the trial had already been made to the Safety Committee. He has not told what evidence he would, or might have offered or developed, if a more formal type of hearing had been held.

All of the foregoing is not to say that if denial of Lewis as a transferee was the product of racial bias or other discriminatory motive, he would be without remedy in a Federal Court. If he was a victim of such motivation, then indeed he was denied the equal protection of the law guaranteed to him by the Fourteenth Amendment.

The District Judge and Lewis rely on our decision in Glicker v. Michigan Liquor Control Commission, 160 F.2d 96 (CA 6, 1947) and read it as holding that the City Commission or the Safety Committee was required to hold a full dress, adversary hearing before denying approval of a transfer to Lewis. *Glicker* did not so hold and we decline to do so. We there announced that the Michigan Liquor Control Commission could not, under guise of regulating the liquor business, deny its citizens *equal protection of the law*. The case came to us on appeal from a District Court order granting a motion to dismiss a complaint which *inter*

on the other hand he was the attorney, and then in this Court action he was suing his client and the licensee.

"And so I ascertained from Paragraph 2 of the Bill of Complaint that Dr. English had entered into a contract in November of 1960, with Patricia Ettress for the purchase of this business and that later on, in May of 1961, Mr. Lewis had acquired a one-half interest in this contract.

"I further noticed * * * that the defendant, Patricia Ettress, had requested the Liquor Control Commission to withhold this transfer for the reason that her debts were greater than the amount that she was going to receive for the business and the transfer of the license, and I recall that on January 16th Mr. Lewis was asked about that, what monetary consideration was involved, and he stated that the price was $18,000.00, but that Patricia Ettress was indebted to him on various items, attorneys fees and other expenses, although I do not recall that he at that time presented an itemized listing of these debts, but anyway the statement was made that the amount of her debt to him was $18,000.00, and that the one would cancel the other, and immediately I wondered about that. * * *

"I also noticed the matter of unpaid taxes, as related in Paragraph 5; that the Federal Taxes had not been paid, and I believe that I learned subsequent to my examination of this Bill of Complaint that there were not only income taxes of Patricia Ettress but also withholding taxes that had not been paid.

"And then the further examination showed that Mr. Lewis was the manager of this business; that he had advanced apparently certain sums of money to pay the debts and obligations of the business. And so after reading those items which appeared in Paragraph 6 and 8, and then also reading Paragraph 9, that the defendant was indebted to him, I might say that my suspicion as to the correctness and the ethics of this matter were confirmed by what he had told us on January 16th and what appeared in the Bill of Complaint, and it seemed to me that he, that is, Mr. Lewis, stood in an untenable position."

Dr. English, present with Lewis at the next to the last meeting on the matter, said "I remember Mr. Vandenberg saying that this woman, this Mrs. Ettress, was losing her legacy and he was interested in protecting her legacy. That was *one of the things* that I remember * * *. Mr. Vandenberg seemed to be very perturbed. The only thing that seemed to worry him was Patricia Ettress losing her legacy." He also remembered Chief Johnson saying to Lewis that he "didn't have the right temperament * * * to run a bar."

*alia* charged that the Commission's action in suspending an existing liquor license,

> *"was intentional and deliberate discrimination* against her on account of political reasons and was done deliberately *for the purpose of treating the appellant in a different manner than any other owner of a Class C liquor license,* and was in violation of her rights under the Fourteenth Amendment to the United States Constitution and Section 1979 of the Revised Statutes of the United States, Title 8 U.S.C.A. § 43." (Emphasis supplied.)

The above allegations had to be accepted as true on motion to dismiss and we held only that the described conduct amounted to denial of equal protection of the law. We took occasion to say:

> "The business [selling of liquor] being one which admittedly may be dangerous to public health, safety and morals * * * the scope of the legislature's power to regulate it is much broader than in the case of its regulation of an ordinary lawful business essential to the conduct of human affairs."

and the scope of our holding is made clear by our conclusion that,

> "In considering the motion to dismiss we are controlled by the allegations of the complaint. It specifically alleges that the Commission acted 'unlawfully, fraudulently, wilfully and illegally' and 'intentionally and deliberately discriminated against' her, and that its action 'was wilful, deliberate and intended solely for a political purpose,' * * * and that the revocation of her license 'was done purposely and with the thought of treating this plaintiff in a different manner than any other owner of a Class C liquor license.' *We believe that those allegations are sufficient to state a cause of action under the equal protection clause of the Fourteenth Amendment * * *.* Whether or not the proof * * * will sustain such allegations is a different question."

The case of Hornsby v. Allen, 326 F.2d 605 (CA 5, 1964) was decided after the District Court's opinion in this case was announced. It is relied upon by appellee for his contention that full due process had to be afforded before denial of the transfer. This, like our *Glicker* case, involved the review of the dismissal on motion of a complaint which charged unconstitutional denial of an application for a liquor license. It charged that such denial was "without reason therefor" and was "arbitrary, unreasonable, unjust, capricious [and] discriminatory." Thus the matter was before the Fifth Circuit with the foregoing allegations admitted. The Court said that "the trial court must entertain the suit and determine the truth of the allegations." The cause was remanded for trial. This case, however, comes to us after a full and extensive trial in which the reasons for denial were fully exposed. We recognize some observations in the Hornsby case as being at odds with our conclusion and to that extent we decline to follow it.

## II. *Denial of Equal Protection.*

■■ We come then to the question whether as a matter of fact plaintiff Lewis was denied a transfer because he was a negro or was otherwise discriminated against. It was his burden to prove his charges in this regard. The District Judge's opinion must be read as a factual finding that Lewis made out such a case. We are of the opinion that such findings were clearly erroneous. Fed.R.Civ.P. 52(a). We so hold, applying the rule of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947) that,

> "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." See also Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed. 2d 1218 (1960).

It is our belief that the District Judge gained an early but erroneous impression that plaintiff Lewis was the victim of racial bias. We are persuaded, however, that his worthy zeal to vindicate Lewis' constitutional right not to be so victimized, led him to inferences that are, on the record of this case, unsupportable.

## A. Racial bias.

At an early pretrial conference, the District Judge remarked "this is a civil rights case." He remarked, "there is not any question about it that this license should continue as a negro operated licensed establishment." The following excerpts from the District Judge's opinion and trial observations portray his conclusion of racial bias and we set them out with our reasons for considering them invalid. (Emphasis is supplied in the quotations.)

1) "This action involves the denial of a * * * of the only *negro-owned-operated* Class C liquor license in a city of over 200,000 population." (222 F.Supp. 352)

"There are only three liquor establishments in the city of Grand Rapids *owned by negroes * * *.*" (222 F.Supp. 381)

" * * * you have only three *negro* establishments in a city of 200,000. *You have an intensity of surveillance of this establishment.* Now if this license goes in escrow, it could very well be the end of the license. Then you have two establishments, colored establishments for a city of 200,000. This is one of the things that has been *predominant and very conspicuous* in this case." (105a, 117a, 118a)

We immediately note that there is no evidence that any other negroes had ever applied for and been denied the right to engage in the liquor business. A transfer from one negro licensee to another was once denied, but the reason therefor was not explored.

The involved license had long been owned by negroes and notwithstanding its earlier revocation by the Liquor Control Commission (not the Grand Rapids authorities), the license was restored to Patricia Ettress, the 23 year old negro heir of her father. Because the Liquor Control Commission did not consider this young lady qualified to manage a bar, the restoration was conditioned upon a negro, plaintiff Lewis, acting as manager. A management agreement was urged and approved by the Grand Rapids Police Department. Of such agreement Lewis said, "This is the only case, by the way, where the police department approved a management agreement." This was in 1959, prior to the troubled history of the bar under Lewis' management.

2) "All three of these liquor establishments are located in Commissioner Lamberts' ward. *She wanted Barnett's Bar closed.* She intended to eliminate the only Class C liquor license *owned by a negro* in the City of Grand Rapids, a city of over 200,000 population." (222 F.Supp. 381)

Such inference is without support in the evidence. It is not disputed that all of the City Commission, including Mrs. Lamberts, were agreeable to and urged transfer of the Barnett license to Dr. English, Lewis' partner and himself a negro.[6] Mrs. Lamberts comes in for special condemnation by the District Judge. It cannot be denied that she took her responsibilities seriously and perhaps pursued them with vigor unwonted in municipal officers. It is a fair inference too that along the route of Mr. Lewis' frequent appearances before the Safety Committee, she developed a lack of confidence in his ability to properly manage a bar as a sideline to his law practice. The District Judge supported his indictment of Mrs. Lamberts by noting his observation of her demeanor on the stand. He emphasized "the very saucy tone of her voice," and that she had stuck out her tongue, and had otherwise employed "facial grimaces" to evidence her dis-

---

6. Dr. English is not a party to this lawsuit.

pleasure. Certainly we do not condone such conduct. We think it proper to observe, however, that such conduct happened during the course of a cross-examination running through several days. Her cross-examination by Lewis was vigorous, with repetitive and unfounded suggestions of derelict conduct by the witness, and covers some 248 pages of transcript. While we may not approve, we easily understand the described facial expressions with which Mrs. Lamberts reacted to her long ordeal—defensive weapons not uncommon to the badgered female. However, they do not prove nor justify an inference of racial bias. It may be relevant to here mention that the trial of this case consumed some 16 trial days and generated a transcript of 1,895 pages, over half of which is made up of Lewis' cross-examination of the Chief of Police and the members of the City Commission. Pretrial hearings are reported in 333 pages of transcript, and there is a supplemental transcript of 201 pages. The District Judge established a segregated record containing some of the defendants' evidence of reasons why it was considered inappropriate to approve Lewis as a transferee. The District Judge was of the view that such evidence was immaterial except to the extent that the thinking of the Commissioners had been communicated to Lewis. The District Judge would not receive evidence offered to prove that Lewis knew of the numbers gambling going on in Barnett's Bar. He so ruled because it was not shown that those who claimed to know of Lewis' knowledge had told the police about it, and no showing was made that the Commissioners had told Lewis that they had evidence that he knew of the gambling.

3) "Mr. Lewis, Barnett's Bar, and all who were associated with it, were made to appear to represent all that was undesirable in taverns and licensed liquor establishments, and especially, *with varying inflections of overtone, a negro bar*." (222 F. Supp. 382)

"It is important to bear in mind that insofar as the *negro population* of the City of Grand Rapids is concerned, it comprises about 7% of the population. *In Commissioners Lamberts' and Jamo's political calculation this was a negligible force which could be disregarded*. Their activities in the case here at issue were before Birmingham." (222 F.Supp. 382)

"There existed in fact a conspiracy on the part of Chief Johnson and Commissioners Lamberts, Sevensma, and Jamo to defeat and deny the transfer, and ultimately to revoke the *only negro-owned Class C liquor license* in a city of over 200,000 population. (222 F.Supp. 382).

The foregoing subjective inferences are invalid and without evidentiary support. There is no evidence that the Negro population of Grand Rapids was desirous of increasing its share of the city's liquor establishments. Invidious discrimination cannot be postulated whenever or wherever a city exists in which the ratio of negro-operated bars to the total number of such businesses is less than the Negro percentage of population. The assertion that Commissioners Lamberts and Jamo politically calculated that this (the ratio of negro-operated bars to the total Negro population) "was a negligible force which could be disregarded" is entirely gratuitous. We find no evidence from which to infer the "political calculation" recited; Mrs. Lamberts became acquainted with Lewis through their being coworkers in the Democratic Party. Commissioner Jamo had received a commendation from the NAACP for his testimony before the state legislature in 1960, then serving as Chairman of the Kent County Civil Rights Committee of the Republican Party.

4) "Chief Johnson was determined to keep the only *negro-owned* Class C liquor establishment closed." (222 F.Supp. 359)

"Chief Johnson wanted to close Barnett's Bar, the lone *negro-owned* Class C liquor license in Grand Rapids." (222 F.Supp. 375)

As Chief of the Grand Rapids Police Department, Johnson had approved the reopening of Barnett's Bar in 1959 after a previous bad record. The approval was signed by Chief Johnson upon condition that Lewis, a Negro, take over its management. It is a fair inference that Chief Johnson's estimate of Mr. Lewis' qualifications as a bar manager deteriorated as the bar's troubles mounted thereafter. As in the case of Mrs. Lamberts, the District Judge supports his charge of malice against the Chief by reference to his witness stand demeanor. "He testified with great difficulty; he was quickly exasperated, and clipped off his answers. When extensive questions were asked by Mr. Lewis, the Chief grew red-faced and tightlipped; the blood vessels in his head bulged out." 222 F.Supp. 373.

The Chief may have remembered Lewis calling him a liar at one of the Safety Committee meetings. Lewis' cross-examination of the Chief covers 133 pages of transcript; it contains unfounded charges of official misconduct, as well as unsupported reflections upon the Chief's personal life. Perhaps the Chief should have better controlled his emotions, but his very natural responses under attack do not convict him of conspiracy, malice, or racial bias.

5) "Dred Scott Madison [*a negro police officer*] claimed that Chief Johnson practiced discrimination, and cited his own demotion as evidence of this discrimination." (222 F. Supp. 370)

This officer testified: "I couldn't believe that he [Chief Johnson] was biased against me himself." He did not cite his own demotion as evidence of racial discrimination by Chief Johnson. He did state that negro officers were constantly "at the bottom of the list" on efficiency ratings. However, Chief Johnson did not control the efficiency ratings and in all events the official and not questioned records of the efficiency ratings ranked officer Madison himself as number 21 out of 62, far from the bottom of the list. The Chief gave the reason for the demotion of Madison and its validity was sustained by the Civil Service Board. It was shown that the negro officer, Madison, was, upon the recommendation of Chief Johnson, promoted to the rank of Sergeant, bypassing several white officers with greater seniority.

6) "The court's discussion of the gambling charges need not be repeated here. The action of the city police in this regard, however, constituted a *discriminatory enforcement of the gambling laws* against a licensed liquor establishment." (222 F.Supp. 382)

The investigation of gambling at Barnett's Bar was the product of the voluntary action of the negro officer Madison, without previous knowledge of or request from the police department. Discovering or suspecting the gambling, he reported it; this was followed by a customary police practice of bringing in an officer from another city, and the officer selected was a negro. After several days of surveillance, he reported that the "numbers racket" was going on at Barnett's Bar and swore to a complaint that named individuals who were carrying on such an enterprise. We cannot join the District Judge's trial characterization of this as "an intensity of surveillance of this establishment." Some of these charges pended for over a year, Lewis appearing for all defendants; they were concluded by a plea of guilty by one of the accused to possession of gambling paraphernalia at "58–60 Ionia Ave." This is the address of the building where the bar is located, and was used in official papers as the address of Barnett's Bar. The District Judge infers that the bar was not involved, but the plea of guilty does not exclude it. The Liquor Control Commission's file contains a report of "Items confiscated from 58–60 Ionia Ave during the Numbers Raid of 8–5–60." The report mentions torn numbers slips and adding machine tapes—indicia of the "numbers racket"—found on the main floor of Barnett's Bar, in its office waste-basket, and in the trash barrel at the rear of Barnett's. Numerous other items of relevant paraphernalia were reported as

seized at 58–60 Ionia, without specification as to whether they were in Barnett's Bar. "Five Green Sheets [familiar to the numbers game] for the week ending 8–4–60" with other material were reported as taken from the office located in the "basement of 58–60 Ionia, S.W. under Barnett Bar." We do not understand how the bar was excluded from involvement. The District Judge's impression of "undue surveillance" may have arisen from lack of evidence of like surveillance or raid of any other bar. There was, however, no evidence that any other bar had been suspected as a base of operations for the "numbers racket". Both the Chief and officer Madison told of raids on gambling establishments—gaming rooms—and the arrest of their white patrons.

We conclude consideration of racial bias by mentioning that the original complaint filed in this cause on November 19, 1962, made no such claim. It was brought into the case by an amended complaint filed on January 2, 1963.

### B. Other discrimination.

The District Judge inferred malice and conspiracy from other conduct which he does not specifically relate to racial bias. With repetitive vigor he indicts the entire City Commission of Grand Rapids, with the exception of the Mayor.[7] Although the evidence does not disclose their content, the news media, radio, TV and newspapers are alleged to have carried stories so extensively "and it was the purpose of Chief Johnson and Commissioner Lamberts to cause this result—that Barnett's Bar became synonymous with all that is undesirable in liquor establishments, and especially in a *negro-owned-operated* liquor establishment. Barnett's Bar and Alphonse Lewis as a consequence *are unpopular in this community*." (Emphasis supplied.) (222 F. Supp. 383) Without relevant record evidence, we are unable to probe the community mind of Grand Rapids. The District Judge hypothesizes that because of

what happened, if a popular vote were held on the question "Shall Barnett's Bar license be revoked?" the vote would be overwhelmingly in the affirmative. (222 F.Supp. 383).

Mrs. Lamberts was found to be the chief offender, with other members of the Commission succumbing to her persuasion. The District Judge concluded that:

1) "Her [Lamberts'] rise to Chairman of the Safety Committee and President of the City Commission, *and the evident voting bloc which she had acquired in the City Commission*, gave her substantial power, which she wielded arbitrarily, capriciously, and unreasonably in this instant case." (222 F.Supp. 381)

Mrs. Lamberts was not Chairman of the Safety Committee at the time of the events here involved. If there is any support for the assertion that Mrs. Lamberts "had acquired" a voting block which "gave her * * * power, which she wielded arbitrarily," etc., it must be found in the following:

"Q. * * * isn't it true that there is a faction * * * of which Mrs. Lambert *is a part* which controls at least four votes * * *?

"A. Well, sometimes I think so, *sometimes* I don't."

In quoting from the foregoing (222 F. Supp. 371) the District Judge assumed that the question was whether Mrs. Lamberts *controlled* the faction, not whether she was *a part of* a faction. The last part of the answer, "sometimes I don't" is omitted. The same examination went on to inquire whether the Commissioners from Mrs. Lamberts' ward and another ward did not always vote on the same side. The answer was, "I wouldn't say so." We find without support the District Judge's further inference that the City Commission "was under her [Mrs. Lamberts'] dominating control insofar as this transaction was concerned."

2) "The court is also aware of one time * * * when Commissioner

---

**7.** The Mayor was not present at any of the meetings of the Safety Committee or

the Commission at which the transfer was considered and voted on.

Lamberts chose to demonstrate her *omniscient attitude* by expostulating that a certain question 'was not worthy of answer.'" (222 F.Supp. 375)

The question which provoked the quoted answer is not set out. It came during plaintiff Lewis' cross-examination of Mrs. Lamberts. It was "In other words, if you want a liquor license don't say anything bad about the police, is that right?"

> 3) "When she [Mrs. Lamberts] phoned the LCC * * * she told them there *was going to be a grand jury investigation* of this transaction." (222 F.Supp. 381)

A memorandum in the Liquor Control Commission records, unidentified as to authorship, referred to a call from Mrs. Lamberts (this was in October, 1962, long after denial of the transfer) wherein she allegedly stated "that the county prosecutor *is thinking about* asking for a grand jury investigation * * *." The prosecuting attorney testified that he had not told Mrs. Lamberts that he was going to call a grand jury *to investigate the Liquor Control Commission,* but said that he had discussed with the Chief of Police the possibility of petitioning for a grand jury "to investigate all of Barnett's Bar affairs, not Mr. Lewis or his connection with it." He never did so, however. Mrs. Lamberts testified that she had heard of this talk from Chief Johnson.

> 4) "When Commissioner Sevensma on cross-examination was informed *of the facts* in the alleged gambling cases, he stated that if he had known these facts, his judgment about the case *would* have been different." (222 F.Supp. 373)

Commissioner Sevensma did not so testify. Mr. Lewis' questions contained Lewis' hypothesis of facts which he contended would have failed to establish that there was gambling in Barnett's Bar. Asked if he knew such to be the facts,

would his judgment have been different, Sevensma answered "I would say yes, *perhaps* it would have been different * * *. It *might* have been different."

We find other factual inferences by the District Judge which, in our view, are without substantial evidentiary support. We forego, however, further extension of the subject. All who questioned Mr. Lewis' conduct were accused as conspirators. An investigator for the LCC who was dissatisfied with Lewis' cooperation was included. "Mr. Arens [LCC investigator for the State] knew, understood, and participated in Chief Johnson's and Commissioner Lamberts' program of delay and denial." [8] (222 F.Supp. 362) All of the condemned City Commissioners were responsible, reputable citizens, elected and re-elected by the people of Grand Rapids. Mrs. Lamberts, the most seriously accused, had taken the trouble to consult with a Dr. Cowles, a negro member of the city's Human Relations Committee, upon the subject of Mr. Lewis' application for transfer. Development of the subject, however, was foreclosed by its exclusion as hearsay.

We believe that Mr. Lewis' record of management of Barnett's Bar and his handling of his client's affairs was such that it cannot be said that denial of the transfer was arbitrary, capricious or discriminatory. Commissioner Sevensma, a graduate of the University of Michigan and a practicing lawyer of upwards of twenty years, when pressed by Lewis to tell why he questioned Lewis' handling of his client's affairs, answered "there was definitely a conflict of interest * * you were the manager, you were the lawyer, you were the creditor, you sued your own client and the licensee."

Commissioner John Vandenberg, a graduate of Calvin College at Grand Rapids and now a professor of economics there, an M.A. and Ph.D graduate of and now a part time teacher at the Uni-

---

8. The Internal Revenue Service is accused in Lewis' complaint which alleges "* * * despite said sale [by which Lewis obtained title to the bar fixtures for $50,00] said Internal Revenue Serv- ice has failed, refused and neglected to remove a so-called 'stop' request filed with the Michigan Liquor Control Commission."

versity of Michigan, was elected in 1960, and was a member of the Safety Committee which recommended denial of transfer. He stated,

> "I had no bias toward Mr. Lewis and I had no bias toward anyone. This is against my own personal philosophical and religious commitments; this was against my commitment to the City which I made when I was sworn in as a City Commissioner to protect the rights of all the citizens of the Community * * *."

He testified that Mr. Lewis was given and employed ample opportunity to present his position to the Safety Committee. He disclosed the reasons which prompted his vote to deny the transfer as follows:

> "I was astonished to have before me a man who, one, first was legal counsel to the licensee, Mrs. Bell,[9] two, who then became manager of the bar, which she had acquired by virtue of the death of her father * * *. Three, who was in court on the same case. Four, who was trying to acquire this and there would be no payment for Mrs. Bell. I cannot conceive of a situation where one person can be in so many roles which are obviously in conflict. * * *

> "For someone to be in management position and in the period of approximately 18 months to see an asset which is alleged to have been worth from $18,000 to $25,000 turn out to be worth nothing, leads me to suspect' that the person who is managing that bar is incompetent, or dishonest, or he is more interested in himself than he is in his client. This was the chief reason why I could not see transferring this particular license to Mr. Lewis.

> "In addition to this, we have other matters such as the infraction of the law; we have the recommendation of the Chief of Police; we have the fact that taxes were not paid. All these together could only convince me that this would not be for the welfare of the City to make this transfer. * * *

> "It was my opinion that Mr. Lewis, because of these many roles, the law infractions, and the recommendation of the Chief, the failure to pay taxes and being in control, as he repeatedly said to us he had the power of attorney, he could hire, fire, he ran the bar and having done such a poor job, in the background of all these roles, I, in good conscience, could not vote for that transfer."

Mr. Vandenberg was not sure as to how much of his reasoning was explicitly addressed to Mr. Lewis although he recalled giving some of them to him.[10] He questioned the policy of public announcement of all of such reasons. He said,

> "Mr. Lewis is a public figure. He is an attorney and as such I think he has a perfect right to go about his business as a lawyer. I think that Mr. Lewis would have been damaged had we expounded in great detail on this particular request, giving the reasons why he did not transfer his license. I have given those by request in this courtroom. I have never given these publicly any other place."

To sustain a finding that denial of Lewis' application was the product of racial bias or other discriminatory motive would require us to leave unreversed a holding that Commissioner Vandenberg's above recital was but a perjurious

---

9. Patricia Ettress had become Mrs. Bell during the time involved.

10. There can be little question, though, that these matters were before the City Commission on July 31, 1962, when the transfer application was denied. It was so testified by Commissioners Barto, Jamo, Sevensma and Vandenberg. There was no attempt to refute any of this testimony except for the District Court's observation that because all the Commissioners agreed, all of their testimony was questionable. 222 F.Supp. 372.

mask [11] to hide his real and vicious motives. We cannot do so. Neither can we discern any basis for the enormous immorality and malfeasance attributed to the other Commissioners by the District Court. These others, of varying professions or means of livelihood [12] were of equally responsible standing and there was nothing in their backgrounds to forecast their capacity for the vicious conduct of which they were convicted. It is significant indeed that plaintiff Lewis does not deny the factual high points of his management of Barnett's Bar and his client's affairs which, justifiably in our view, led an entire City Commission to find him unsuited to manage or become the licensee of Barnett's Bar. Even though this history may have caused some personal dislike of Mr. Lewis that, by itself, does not add up to a denial of equal protection of the law. That no Commissioner had any beginning opposition to Mr. Lewis, racial or otherwise, is shown by the following excerpt from his cross-examination:

"Q. And looking back at it now, even as of this date, do you assert there was any antagonism toward you by any of the members of that committee as of that date, January 16, 1962?

"A. No."

We make clear just what we decide.

1. Plaintiff Lewis was not, under Glicker v. Liquor Control Commission, 160 F.2d 96 (CA 6, 1947) entitled to a full dress, trial type, hearing on his applicati onfor transfer; he was not deprived of any federally granted constitutional right by the manner in which such application was considered and approval withheld.

2. Plaintiff Lewis was, under *Glicker* and other authorities, entitled to the "equal protection of the law" guaranteed by the Fourteenth Amendment.

3. If denial of Lewis' application for transfer was the product of racial bias or other discriminatory motive, such denial would be a deprivation of the equal protection of the law.

4. The District Judge's findings as to racial bias and discriminatory motive on the part of the Grand Rapids City Commission are clearly erroneous, within the meaning of Rule 52 Fed.R.Civ.P. as the term "clearly erroneous" has been articulated by United States v. United States Gypsum, 333 U.S. 364, 375, 68 S.Ct. 525, 92 L.Ed. 746, 766 (1948).

5. We do not reach the question of whether Lewis or the trustee in bankruptcy were denied due process or equal protection of the law by the revocation of the license for Barnett's Bar. The appeal does not present such question.

The judgment of the District Court as it conflicts with this opinion is reversed; the cause is remanded to the District Court with direction to vacate its order setting aside the July 31, 1962, resolution of the Grand Rapids City Commission denying approval of the Lewis application for transfer and with direction to dissolve the mandatory injunctive

11. The District Judge characterized the reasons given by Vandenberg and the other Commissioners as "a facade for the real reasons behind the action of the Safety Committee and the personal and racial discrimination of Chief Johnson." (222 F.Supp. 383)

12. Commissioner Lamberts is the wife of a neurological surgeon of Grand Rapids and herself a graduate of the University of Michigan School of Nursing; Commissioner Barto is a mortician, at one time a liquor licensee and had been a member of the Commission for 15 years; Commissioner Sypniewski had been a member of the Commission since 1960 and was Sales Manager of a business concern of statewide coverage; Commissioner Jamo owns his own business involving the selling of vacuum cleaners and sewing machines, is a 35 year old economics graduate of the University of Michigan, president of the local chapter of the alumni of that school, and as stated, the recipient of a commendation by the NAACP for his work in its behalf; Commissioner Sevensma was shown to have been an active worker for the election of a Negro, Judge Letts, who was elected a judge of the Municipal Court over opposing white candidates.

order requiring the City and its Chief of Police to approve a transfer to Lewis of the involved license.

The judgment of the District Court is, to the foregoing extent, reversed.

EDWARDS, Circuit Judge (concurring).

For the reasons stated in the five numbered paragraphs at the conclusion of the court's opinion, I concur in the decision set forth thereafter.