Theodore CUEVAS, Appellant,

v.

Tom SDRALES, dba The Seventy-Three Inn, Salt Lake City Corporation, and Police Officer Rex LeFevre, Appellees.

No. 7973.

United States Court of Appeals Tenth Circuit.

May 10, 1965.

Before PICKETT, BREITENSTEIN and HILL, Circuit Judges.

PICKETT, Circuit Judge.

Theodore Cuevas brought this action, seeking to avail himself and others similarly situated, of the injunctive relief provided for in Title II of the Civil Rights Act of 1964. 78 Stat. 241, 42 U.S. C. § 2000a et seq. He alleges that the

defendant Tom Sdrales was the owner of a tavern in Salt Lake City, Utah, dispensing food to be consumed on the premises, which affected interstate commerce, and refused to serve him because he was a negro. Cueves refused to leave the premises and was arrested by a city policeman and taken to jail. The second count of the complaint asked for money damages because of this arrest.[1] On motion to dismiss it was shown that the tavern was primarily engaged in selling beer for consumption on the premises, and did not serve meals or other food to be eaten as is customary in restaurants, cafeterias, lunch rooms, lunch counters and soda fountains. The trial court held that the tavern was not a place of public accommodation within the meaning of the Act, and dismissed the complaint.[2]

Title II of the Act provides for injunctive relief against discrimination in places of public accommodation as such places are defined in the Act. The pertinent provisions of Title II are as follows:

"Sec. 201.(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

"(1) * * *

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(3) * * *

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

"(c) The operations of an establishment affect commerce within the meaning of this subchapter if * * (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce * * *."

The gist of appellant's contention is that when Sdrales sold beer in his tavern, he was selling food and was an "other facility principally engaged in selling food for consumption on the premises." We are of the view that the contention is not supported by either the language of the Act or its legislative history.

Section 201(b) (2) of the statute refers specifically to restaurants, cafeterias, lunch rooms, lunch counters, and soda fountains, or other facility selling food. All the places specifically designated are facilities where food is sold to be eaten. Ordinarily, when specific terms in a statute are followed by general terms, the general terms are limited to matters similar to those specified, unless to do so would defeat the obvious purposes of the statute. United States v. Alpers, 338 U.S. 680, 70 S.Ct. 352, 94

---

1. No issue regarding the dismissal of the second count was raised on this appeal.

2. No contention was made that the tavern is located within the premises of any establishment otherwise covered by the Act.

L.Ed. 457; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522; Bumpus v. United States, 10 Cir., 325 F.2d 264; Commercial Ins. Co. of Newark, N. J. v. Watson, 10 Cir., 261 F.2d 143; Sandack v. Tamme, 10 Cir., 182 F.2d 759; Cain v. Bowlby, 10 Cir., 114 F.2d 519, cert. denied 311 U.S. 710, 61 S.Ct. 319, 85 L.Ed. 462.

The obvious purpose of Section 201(b) (2) is to prevent discrimination in places where food is served to be eaten and the general provisions of the section are limited to such places. Beer, and similar drinks, might in some instances be classed as food, as they supply some nutriment to the body, but generally, beer is considered a drink, and although it may be served in eating places, a place serving only beer is not considered a restaurant, cafeteria, lunch room, lunch counter or soda fountain. See, generally, Words and Phrases, Beer, Food, and Restaurants.

The public accommodations provisions of the Act have been held to be a constitutional exercise of the commerce power given to Congress. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258; Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290. But this case appears to be one of first impression on the specific question of the businesses covered by Title II of the Act. The passage of the Act followed extensive hearings. A study of the hearings before the different committees and the debates in Congress illustrates, we think, that Congress did not intend to include all establishments to which its constitutional powers might extend. The legislation was aimed at the aggravated sources of discrimination which affected interstate commerce. Many business establishments were not included within the scope of the Act. It was thought that if the most flagrant and troublesome areas of discrimination were eliminated by law, the less bothersome would disappear through voluntary action and public effort. Senator Humphrey, in discussing before the Senate the limitations on the coverage intended in Title II, said:

"The deletion of the coverage of retail establishments generally is illustrative of the moderate nature of this bill and of its intent to deal only with the problems which urgently require solution. Discrimination in retail establishments generally is not as troublesome a problem as is discrimination in the places of public accommodation enumerated in the bill. And it seems likely that if discrimination is terminated in restaurants and hotels, it will soon be terminated voluntarily in those few retail stores where it still exists." Cong.Record, 88th Congress, 2d Session, Vol. 110, No. 58, March 30, 1964.

When the Attorney General testified before the House Judiciary Committee on the major problems of racial discrimination in business enterprises with which Congress should concern itself, he said:

"First, the extent to which businesses potentially affected do in fact discriminate against Negro customers;

"Second, the extent to which enforcement in key businesses would induce voluntary practices in others within the same community;

"Third, the areas of coverage should be clear to both the proprietors and the public; and

"Fourth, the utility and wisdom of promoting local solution to these problems and decreasing the need for Federal regulation.

"These criteria were employed in the bill submitted by the President and introduced by the chairman. It was confined to those business establishments which on the basis of current experience have proved to be the most important sources of discrimination, and, therefore, the focal point of most of the demonstrations.

"That bill specified hotels and motels, restaurants and lunch counters,

retail stores and gasoline stations, movie houses, and similar places of public amusement. The coverage was quite explicit. We did not include other establishments which were constitutionally within the reach of Federal regulations, either because they do not customarily discriminate or because we felt that—given a solution to the major problems—removal of these discriminatory practices could be voluntarily induced. We are reluctant to extend Federal power beyond those areas where it was clearly needed to meet existing problems." Hearings, House Judiciary Committee on H.R. 7152, as amended, 88th Cong. 1st Sess. pp. 2655–56.

Senator Magnuson, as Chairman of the Senate Committee for Commerce, to which the bill was referred for hearings, was assigned the task of presenting Title II of the Act to the Senate when the bill came on for debate. He announced that the purpose of his remarks and discussion was to build "a legislative history to aid the courts and [to provide] an explanation of this title to the American public." In his reference to Section 201(b) (2), he stated that establishments included within that section were facilities engaged in selling food for consumption on the premises. Throughout his remarks, the inference is clear that the section

covered eating establishments and not those principally engaged in selling drinks. In explaining the businesses intended to be covered by the language, he said:

"Most public eating places would be within the ambit of title II because of their connection with interstate travelers or interstate commerce. And in some areas, public eating places would come within the ambit of title II, because of the factor of State action.

"At any rate, it is clear that few, if any, proprietors of restaurants and the like would have any doubt whether they must comply with the requirements of title II.

"The specific mention in section 201(b) of eating facilities 'located on the premises of any retail establishment' is aimed principally at such facilities in department and variety stores.

"A bar, in the strict sense of that word, would not be governed by title II, since it is not 'principally engaged in selling food for consumption on the premises.' "[3] Cong. Record—Senate, 88th Cong. 2d Sess. Vol. 110, Part 6, p. 7406.

◼ When the importance of this legislation is considered in the light of the public interest which it created, it ap-

---

**3.** Senator Magnuson, with reference to this portion of the bill also said: "A few weeks ago the Senator from Louisiana [Mr. Long] stated that he was not clear as to when bars or nightclubs would be subject to the provisions of title II. As a general rule, establishments of this kind will not come within the scope of the title. But a bar or nightclub physically located in a covered hotel will be covered, if it is open to patrons of the hotel. A nightclub might also be covered under section 201(b) (3) if it customarily offers entertainment which moves in interstate commerce. A business which describes itself as a bar or nightclub would also be covered if it is 'principally engaged in selling food for consumption on the premises.' And, of course, a bar or nightclub would be covered under section 202 in the rare case

in which State law required it to segregate or discriminate.

\* \* \* \* \* \* \*

"The following establishments would, therefore, be generally exempt: Barber shops and beauty parlors. Lawyers, doctors, and other professional people. Dance studios. Bowling alleys and billiard parlors." Cong. Record—Senate, 88th Cong. 2d Sess. Vol. 110, part 6, p. 7407.

Referring to the coverage of the provisions of Section 201 (b) (2), Senator Young of Ohio said: "Second. Restaurants, lunch counters, soda fountains, and other facilities engaged mainly in the business of selling food to be eaten on the premises. Specifically included in this category are eating places located within retail stores." Cong. Record, supra, at 7384.

pears most likely that if the legislation were intended to cover such places as bars and taverns, where the sale of drinks is the principal business, Congress would have specifically included them. Furthermore, the Department of Justice of the United States, in an analysis of Title II, furnished to the United States Attorneys, quotes from Section 201(b) (2) and says:

"A bar or tavern which serves little or no food is not covered."

This Act grew out of a bill proposed by the Administration. No one was more intimately involved in its preparation or more cognizant of the intended coverage of the final version than the Attorney General.

Affirmed.