In the Matter of HERMINA FORMAN et al., Doing Business as HALSEY WINE & LIQUOR STORE, Petitioners, *v.* NEW YORK STATE LIQUOR AUTHORITY et al., Respondents.

Supreme Court, Special Term, Kings County, December 20, 1966.

*Robert W. Corcoran* for petitioners. *Hyman Amsel* for New York State Liquor Authority and another, respondents. *Blacker & Mitzner* for Morris M. Schecter and another, respondents.

FRANK S. SAMANSKY, J. In this proceeding pursuant to section 123 of the Alcoholic Beverage Control Law, petitioners seek again to enjoin issuance of a retail liquor package store license by respondent Authority after remand for further consideration by the Court of Appeals (*Matter of Forman* v. *New York State Liq. Auth.*, 17 N Y 2d 224). In remitting this matter, the Court of Appeals directed the State Liquor Authority "to develop a complete record as to the package store license application and to establish the basis for the Authority's conclusion that the grant of the license will promote ' public convenience and advantage ' (Alcoholic Beverage Control Law, §§ 2, 63, subd. 6)." (p. 228). The remand was based upon the assumption of the court that the Authority, in order to sustain its determination " when challenged in court, although it need not produce ' findings ' of the conventional sort, must show forth a rational basis for its conclusion as to ' public convenience and advantage '." (p. 229).

It is the position of the respondent Authority that the record now presented is based on a full investigation and justifies its determination to reaffirm the issuance of the license. In the light of the decision by the Court of Appeals, the test here should be whether there is a " rational basis " for such determination.

At least two independent investigations were initiated at the direction of the Authority following the remand. The reports of these two investigators agree in essential particulars: The applicants' store will be located at 1571 Broadway in Brooklyn, New York, just off a busy intersection with heavy pedestrian and vehicular traffic controlled by seven sets of traffic lights

and a " walk and wait " pedestrian signal. Three bus lines run through this intersection. An elevated railway has a station overhead with two approach stairways each on opposite sides of the same block where the proposed store will be located. Broadway at this point is solidly lined with stores for blocks in each direction. Although there are some vacant stores and there has been a trend toward lower quality merchandise stores in recent years, the area is undeniably a business and commercial shopping hub. It is patronized not only by persons living in primarily residential areas north and south of Broadway but also by transients who make connections from and to the elevated railway and the various bus lines here. There has probably been some increase in population as a result of larger families and more intense use of existing housing facilities. Moreover, there is presently in course of construction a 16-story low-rent apartment dwelling one block from applicants' premises which will contain 130 units with an estimated average of three to four persons per unit. There should thus be a clear increase in population of between four to five hundred persons since the space occupied by the new building was previously almost exclusively dead storage area.

A good deal of discussion and argument here has centered about the apparent close proximity of the petitioners' store and the applicants', which are alleged to be 75 feet apart. However, the Authority's position here is that the proximity is largely illusory since they are separated by Broadway and Halsey Street, two busy thoroughfares. Additionally, the Authority points out that passengers descending from the elevated railroad will have access to the new store without crossing any street and that although there is a similar stairway to the elevated station on the other side of Broadway, patrons of petitioners' store must cross Halsey Street to and from that stairway. The Authority further justifies this location on the ground that Broadway marks the dividing line between the " Bushwick " and " Bedford-Stuyvesant " areas. The Bushwick side of Broadway (where applicants' store would be located) is alleged to be the better and more heavily travelled and patronized side. The nearest such package store for residents north of Broadway on the Bushwick side is 1,400 feet away. The original record before the Court of Appeals showed four stores, including that of petitioners, within a distance of 600 feet from the proposed store. Three of these stores are no nearer than 500 feet away. The record further shows that an additional newly licensed store is 800 feet away.

Without question the respondent Authority has devoted a great deal of time and care to justify its position here. Considerable attention by all parties has been given to questions of traffic, consumer need, gross income of competing stores, crime statistics in the area, etc. Petitioners contend that a broad statement concerning pedestrian activity is invalid unless an actual pedestrian count is undertaken; that an estimate of population increase is unacceptable without government census figures. I do not believe that such a minute dissection of each particular is indicated or warranted. Petitioners further assert that the conclusion of the Authority that liquor consumption is not related to crime statistics in the area is unacceptable unless positive proof is presented to support it. I cannot agree. If there were any connection between crime and liquor here, the presence of at least five bars (as disclosed by the diagram attached to the report of June 24, 1966 of the Authority's inspector) within a one-block radius of petitioners' premises would be cause enough for concern. I hold to the thesis that a thirsty citizen will not be lightly deterred by a distance of two or three blocks to his source of supply. Distance in such situations does not lend disenchantment. I find no correlation between accessibility and overindulgence.

Given a reasonbly complete record such as I find here, the prime question is whether it meets the requirement of the Court of Appeals that it show forth a " rational basis " for the conclusion by the Authority to issue the license. I believe it does. " Rational " does not mean " overwhelming ". The issue here is not what this court would have done in the Authority's place (see *Sheil Liqs.* v. *Caraluzzi,* N. Y. L. J., Oct. 6, 1966, p. 15, col. 6 [HELMAN, J]). Discretion as to whether the license is to be issued or withheld is vested in the members of the Liquor Authority under section 2 of the Alcoholic Beverage Control Law where it is stated that the objectives of fostering and promoting temperance " will be best carried out by empowering the liquor authority of the state to determine whether public convenience and advantage will be promoted by the issuance of licenses to traffic in alcoholic beverages * * * subject only to the right of judicial review hereinafter provided for."

Availability of liquor at a price within the reach of the average consumer's pocketbook is probably just as important a consideration in determining convenience and advantage as distance. On that score the Court of Appeals in *Seagram & Sons* v. *Hostetter* (16 N Y 2d 47), in reviewing the Moreland Commis-

sion Report, stated: " The Commission's studies led it to believe that assumed favorable relation of high-priced liquor to temperance was chimerical. The prices of liquor in New York were high, but consumption had steadily risen and this did not indicate high prices increased temperance. It found ' a greater than average ' increase in per capita consumption in New York (Moreland Comm. Report No. 1, p. 3)." The broad change in the philosophy underlying the revisions advocated by the Moreland Commission and carried through by the Legislature is further emphasized in this case by the following: " This change from a favored and protected profit position to a possibly sparse profit situation may make it economically difficult for the liquor industry. If it does it is within the competence of the New York Legislature to make it that way."

The case of *Matter of Hub Wine & Liq. Co.* v. *State Liq. Auth.* (16 N Y 2d 112), appears to be in point here. There, too, considerations of public convenience and advantage motivated issuance of a license for a location " without the necessity of crossing such heavily trafficked streets as East 149th Street and Third Avenue." (p. 118). The court quoted from the Moreland Commission Report which stated that " there is no discernible connection between temperate and lawful behavior and the establishment of such arbitrary and compulsory distances between package stores. These distance requirements have no present purpose except to restrict competition " (p. 117) and concluded that it marked " a reversal by New York of the public policy of artificial restrictions on competition in retail liquor sale and an asserted freeing of the Liquor Authority's power to eliminate these legally protected monopolies. The statute was not enacted in a vacuum. It was addressed to elimination of a specific public evil and more than literal ' distance ' between stores was involved in this change of policy. The change essentially was toward a free market for the sale of liquor in the interest of the consumer."

As additional grounds for objection here, petitioners have set forth detailed figures of their gross income for the current year in an effort to show that there has been a reduction month by month over comparable figures for the year 1963 which was used by the Authority in its original report. I have carefully scrutinized these figures as well for the years 1964 and 1965 for this store and other stores in the area as shown in the later report by the Authority. I find that petitioners' gross income is still in excess of $3,000 per week and that of at least one other store in the area to be in excess of $5,000 per week. In the circumstances, although it is not within the province of

this court to measure the economic welfare of these competitors, I find no economic distress at this point.

There has been in past cases much discussion also as to whether section 123 necessitating an application for an injunction with its criterion of " illegality " was indeed intended by the Legislature as a medium for this type of proceeding to bar issuance of a license. The question has been finally determined and settled by cases such as *Matter of O'Brien* v. *Rozza* (271 N. Y. 545), *Matter of McNulty* v. *State Liq. Auth.*, (17 N Y 2d 434), and this instant case, and there is no question now about the validity of such a proceeding. However, there still remain the very pertinent tests by which every application for an injunction should be measured. Such a remedy is a drastic and sweeping one which should be granted only where the right to it is clear. I do not find that the facts here justify so extraordinary a remedy.

On balance, I believe that the respondent Authority has established its right to make this determination and that considerably better arguments than those advanced by petitioners should be required to nullify that determination. The petition is dismissed.