Faith A. SEIDENBERG and Karen
DeCrow, Plaintiffs,

v.

McSORLEYS' OLD ALE HOUSE, INC.,
Defendant.

No. 69 Civ. 2728.

United States District Court,
S. D. New York.

June 25, 1970.

Faith A. Seidenberg, Syracuse, N. Y., for plaintiffs; Rosemary Pooler, Syracuse, N. Y., Bruce J. Ennis, New York City, of counsel.

William F. Larkin, New York City, for defendant.

MANSFIELD, District Judge.

Two determined ladies, both board members of the National Organization for Women ("NOW"), have brought this suit pursuant to 42 U.S.C. § 1983[1] challenging defendant's 115-year practice of catering to men only. They claim that defendant's refusal to serve women at its bar constitutes a denial of rights secured by the Equal Protection Clause of the Fourteenth Amendment.[2] Both parties have moved for summary judgment. For reasons stated in detail below, plaintiffs' motion is granted and defendant's denied.

---

[1]. Title 42 U.S.C. § 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
Title 28 U.S.C. § 1343(3) establishes original jurisdiction in the district courts to entertain civil actions based upon § 1983.

[2]. " * * * No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

The essential facts are not in dispute. Defendant McSorleys' Old Ale House, Inc. is a New York corporation operating a bar located at 15 East 7th Street in New York City. While food may be purchased on the premises, the complaint specified, and it is conceded, that McSorleys' is "primarily a bar which serves alcoholic and non-alcoholic beverages." On January 9, 1969, plaintiffs, unescorted by any male companions, entered McSorleys' and seated themselves at the bar. Their request for service was refused by the bartender, who informed them that it was McSorleys' policy, and had been for 114 years, to refuse to serve women under any conditions. Their repeated requests for service were met with similar refusals. Thereupon they were escorted by the bartender to the door and voluntarily departed, wisely choosing to stage this battle of the sexes in the courthouse rather than resort to militant tactics. Their action accords with the principle that an ale house, with its "nut-brown drafts," should be treated as a peaceful center and source of happiness, once described by Johnson as "the throne of human felicity."

On June 24, 1969, plaintiffs commenced this action under 42 U.S.C. § 1983, seeking both a declaratory judgment that defendant's refusal to serve women is illegal, discriminatory and unconstitutional, and an injunction against continuation of defendant's practice. Following Judge Tenney's denial of a motion to dismiss the complaint, 308 F.Supp. 1253 (S.D.N.Y.1969), defendant filed its answer on December 15. These motions for summary judgment ensued.

Plaintiffs' action must stand or fall on the applicability of 42 U.S.C. § 1983. We are in accord with Judge Tenney's conclusion that § 201(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(a), guaranteeing to all persons the full and equal enjoyment of public accommodations without discrimination on account of race, color, religion or national origin, applies neither to discrimination on the basis of sex, DeCrow v. Hotel Syracuse Corp., 288 F.Supp. 530, 532 (N.D.N.Y.1968), nor to discrimination in a bar or tavern whose principal business is the sale of alcoholic beverages rather than food. Cuevas v. Sdrales, 344 F.2d 1019, 1020–1023 (10th Cir. 1965), cert. denied, 382 U.S. 1014, 86 S.Ct. 625, 15 L.Ed.2d 528 (1966).[3] It further appears that the sections of the New York Civil Rights Law dealing with discrimination in places of public accommodation on the basis of race, creed, color or national origin do not extend to discrimination on the basis of sex, and that a complaint virtually identical to that before us does not state a cause of action under that law. DeCrow v. Hotel Syracuse Corporation, 59 Misc.2d 383, 298 N.Y.S.2d 859 (Sup.Ct.1969).[4]

---

3. See also Newman v. Piggie Park Enterprises, Inc., 377 F.2d 433, 436 (4th Cir. 1967), modified as to counsel fees, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Fazzio Real Estate Co. v. Adams, 396 F.2d 146, 149–150 (5th Cir. 1968); Robertson v. Johnston, 249 F. Supp. 618, 621–622 (E.D.La.1966), rev'd on other grounds, 376 F.2d 43 (5th Cir. 1967); Tyson v. Cazes, 238 F.Supp. 937, 942 (E.D.La.1965), rev'd on other grounds, 363 F.2d 742 (5th Cir. 1966); Pania v. City of New Orleans, 262 F. Supp. 651, 652–653 (E.D.La.1967); United States by Clark v. Fraley, 282 F. Supp. 948, 954 (M.D.N.C.1968).

4. It seems clear that were plaintiffs to comply with the procedural requirements of § 297(9) of Article 15 of the Executive Law [known as the "Human Rights Law"; see § 290(1)], (McKinney's Consol.Laws, c. 18, Supp.1969–1970), they would be met with the same argument. Under § 292 of the Law, McSorleys' would be considered a "place of public accommodation," but discrimination on the basis of sex is conspicuously absent from the list of unlawful discriminatory practices relating to public accommodations contained in § 296(2). Compare § 296(1) and (1–a), which deal with employment and training programs and which explicitly prohibit discrimination on the basis of sex.

The inclusion of prohibitions against sex discrimination in the latter two subsections followed passage of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq., conforming to that en-

There being "no genuine issue of material fact" between the parties, 6 J. Moore, Federal Practice ¶ 56.04[1] (2d ed. 1966), plaintiffs are entitled to summary judgment if they can establish that defendant was acting under color of state law in its continuing practice of refusing service to women, and that such refusal has denied plaintiffs the equal protection of the laws secured by the Fourteenth Amendment to the Constitution.

### State Action

 Beginning with Mr. Justice Bradley's opinion for the Court in the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the principle has become firmly embedded in our constitutional law that the Equal Protection Clause of the Fourteenth Amendment reaches "only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). No simple or precise test for distinguishing between state action and private action has, however, yet been devised, in spite of "eight decades of metaphysical writhing around

the 'state action' doctrine" by both courts and commentators. Black, Foreword, The Supreme Court 1966 Term, 81 Harv. L.Rev. 69, 89 (1967). Justice Bradley stated only that the requirement was for "acts done under State authority," a standard met by "State action of every kind." 109 U.S. 3, at 13, 11, 3 S.Ct. 18, at 22, 21. The state involvement need not be exclusive or direct, United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). It may occur through the action of a state's executive body, its administrative and regulatory agencies, its legislature, or its courts. Lombard v. Louisiana, 373 U.S. 267, 273, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Robinson v. Florida, 378 U.S. 153, 156, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Avery v. Midland County, 390 U.S. 474, 479, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); Shelley v. Kraemer, 334 U.S. 1, 14–15, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The state need not expressly or specifically authorize, command or support the discriminatory conduct. Where the state has become sufficiently involved, its inaction, acquiescence or continuation of its involvement under circumstances where it could withdraw, may be sufficient. Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).[5] Accordingly

---

actment and enabling appropriate state agencies to cooperate in the enforcement of the federal legislation. Ch. 516 [1965], McKinney's Session Laws of New York 704; id. at 2110. See also Ch. 202 [1967], McKinney's Session Laws of New York 194. The absence of similar prohibitions in the public accommodations subsection is presumably a result of their absence from the federal statute. In spite of defendant's suggestion that these parallel omissions demonstrate a deliberate legislative decision not to forbid sex discrimination in public accommodations, there is no evidence of consideration of the issue in Congress during debate over the 1964 Act to support such an inference. It seems more likely that the explanation for the failure to include sex among the forbidden bases of discrimination listed in Title II is that discrimination in employment was simply considered of more pressing importance by the proponents of sex-discrim-

ination legislation, or even that the need for such legislation in the area of public accommodations may never have occurred to them.

5. "As the Chancellor pointed out, in its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. * * * By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint

the issue has usually been resolved—almost always in favor of finding state action—by reference to the *kind* and *degree* of state involvement alleged. The issue has been posed in terms of whether "to some *significant extent* the State in any of its manifestations" has become involved in the discriminatory practice under attack. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961) (emphasis added). No recasting of formulas, however, can simplify the inherent complexities in application of the state action requirement. As Mr. Justice Clark wrote in Burton:

> "Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' [citation omitted] Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." (365 U.S. at 722, 81 S.Ct. at 860)

See also Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).[6]

■ In approaching the task of "sifting facts and weighing circumstances,"

it is important to consider the purpose and function of the state action limitation. A finding of no state action does not eliminate the discrimination; it is a determination that regardless of the discrimination the Federal Government is not to be permitted to interfere. The function of the state action concept is to bar the Fourteenth Amendment from being used to govern purely private life and private decisions. The right of equal protection must be balanced against the countervailing rights of individual freedom of association and freedom of choice that govern in private matters. A person still has the right to invite to his home only those guests whom he or she chooses, whether they be all black, white, men, women, old or young. Under the Fourth Amendment a person's home remains his or her castle. Likewise, that person may, in a private transaction, sell his belongings to whomever he pleases. But once a property, facility or transaction becomes significantly impregnated with a state character the Equal Protection Clause controls. Burton v. Wilmington Parking Authority, *supra*.

■ In determining whether state involvement has risen to the level of "significance" for state action purposes, therefore, inquiry should focus upon the alleged sphere of privacy and autonomy in need of protection from federal intervention, as well as upon the customary search for some causal relation, however tenuous, between state activity and the discrimination alleged. For instance, a state lessee may not exclude black persons from its restaurant. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

---

participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S. at 725, 81 S.Ct. at 861.

**6.** As the most recent Supreme Court decision discussing the problem states:

"On the one hand, the Fourteenth Amendment plainly prohibits a State from itself discriminating because of race. On the other hand, § 1 of the Fourteenth Amendment does not for-

bid a private party, not acting against a backdrop of state compulsion or involvement, to discriminate on the basis of race in his personal affairs as an expression of his own personal predilections. * * * At what point between these two extremes a State's involvement in the refusal becomes sufficient to make the private refusal to serve a violation of the Fourteenth Amendment, is far from clear under our case law." Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (June 2, 1970).

The use of state courts to enforce purely private easements by owners of land prohibiting black occupancy has been held to constitute state action. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). If the state engages in conduct having the effect of encouraging, tolerating or acquiescing in the discrimination, the Fourteenth Amendment may be invoked. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).[7]

Turning to the case before us, we are asked to find state action in the licensing of McSorleys' Old Ale House under the New York State Alcoholic Beverage Control Law. No other state involvement in the policy complained of is alleged by plaintiffs. There was no state enforcement of the refusal to serve, cf. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), no use of state property, cf. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Boman v. Birmingham Transit Co., 280 F.2d 531 (5th Cir. 1960), 292 F.2d 4 (5th Cir. 1961), and no performance of a governmental function, cf. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), or the like.

The Supreme Court has never passed upon a licensing theory of state action, although two Justices have expressed conflicting views on the matter. Compare Garner v. Louisiana, 368 U.S. 157, 184–185, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) (Douglas, J., concurring); Lombard v. Louisiana, 373 U.S. 267, 281–283, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963) (Douglas, J., concurring); and Reitman v. Mulkey, 387 U.S. 369, 384–386, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (Douglas, J., concurring), with Bell v. Maryland, 378 U.S. 226, 333, 84 S.Ct. 1814, 12 L.Ed. 2d 822 (1964) (Black, J., dissenting). The reasoning in favor of finding state action is that the state license enables the private licensee to engage in discriminatory conduct in the exercise of its franchise rights. To put it another way, without the state license to serve beer, defendant here could never have discriminated in the sale of beer. The license, it is argued, becomes a license to discriminate. See Justice Douglas' concurring opinions in *Garner, Lombard* and *Reitman, supra.* The opposing view is that in the absence of further evidence the license neither relates to nor authorizes discrimination in the exercise of the rights granted. It does not constitute the licensee an administrative agency of the state, and the state, as licensor, does not dictate to the licensee whom it must serve.[8] In rebuttal the advocates of

---

7. While the growth of the state action concept has taken place almost entirely in the peculiarly sensitive context of "the sordid business of racial discrimination," Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (June 2, 1970) (Brennan, J., concurring), we can see no reason in logic for applying different principles to a case involving discrimination on the basis of sex.

"Granted 'that the post-Civil War amendments ought to be taken as applying with a highly special force to the racial field,' 81 Harvard Law Review at 70, this would seem to go to the constitutionality rather than the existence of state action. Why would there not equally be 'state action' when the state refuses to prevent discrimination on the ground of religion, sex or age, even though in those cases the dis-

crimination may be more easily justified?" H. Friendly, The Dartmouth College Case and the Public—Private Penumbra 35 n. 50.

8. Of the 10 state action cases we have been able to find in which a licensing argument figured significantly in the court's decision, only one, later reversed on appeal, has found state action in a mere licensor-licensee relationship. Mitchell v. Delaware Alcoholic Beverage Control Commission, 193 A.2d 294 (Del. Super.), rev'd, 196 A.2d 410 (Del.Super. 1963). See also State v. Brown, 195 A.2d 379, 384 (Del.Super.1963). In one other case, Anderson v. Moses, 185 F. Supp. 727, 732–734 (S.D.N.Y.1960), a license agreement providing for regulation of a restaurant concession in "meticulous detail," 185 F.Supp. at 732, con-

state action reply that no such state authorization was found in the landlord-tenant relationship in Burton v. Wilmington Parking Authority, *supra.*

■ We believe that the present case is distinguishable from those licensing cases where courts have shied away from finding state action, because here we are not dealing merely with a bare state licensor-licensee relationship. In addition we are faced with a *pervasive* regulation by the state of the activities of the defendant, a commercial enterprise engaged in voluntarily serving the public except for women. Furthermore, the state has continued annually to renew defendant's license over the years despite its open discrimination against women, without making any effort in the exercise of the broad authority granted it, to remedy the discrimination or revoke the license which defendant must have in order to practice it. These circumstances convince us that the state's participation here is significant, as distinguished from situations where the licensor-licensee relationship is not accompanied by any extensive state regulation and the licensee is not a commercial establishment or has not offered its facilities or services to the public generally.[9]

■ For many years there has been no inherent right to engage in the sale of intoxicating beverages.[10] The business has long been considered one peculiarly fraught with danger to the community, and the power of a state to eliminate traffic in liquor within its borders altogether, as well as to impose any limitations thereon short of absolute prohibition, or even to arrogate to itself the entire business of distributing and

tributed to a finding of state action. In addition, however, the concession's land, building and physical facilities were all owned by the City of New York, 185 F. Supp. at 733, rendering a finding of state action almost a foregone conclusion. The remaining cases have rejected the licensing rationale, holding variously that a license must be distinguished from a "franchise" or special privilege granted by the state, Madden v. Queens County Jockey Club, 296 N.Y. 249, 254–256, 72 N.E.2d 697, cert. denied, 332 U.S. 761, 68 S.Ct. 63, 92 L.Ed. 346 (1947), or that the licensing act in question simply conditioned the licensee's right to engage in purely private action, Weyandt v. Mason's Stores, 279 F.Supp. 283, 287 (W. D.Pa.1968), cited with approval in Van Daele v. Vinci, 294 F.Supp. 71, 74 (N.D. Ill.1968).; Jones v. Alfred H. Mayer Co., 255 F.Supp. 115, 127 (E.D.Mo.1966), aff'd, 379 F.2d 33, 45 (8th Cir. 1967), rev'd on other grounds, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), or that it did not render the licensee an administrative agency of the State, Madden v. Queens County Jockey Club, 296 N.Y. 249, 254–256, 72 N.E.2d 697, cert. denied, 332 U.S. 761, 68 S.Ct. 63, 92 L.Ed. 346 (1947); Watkins v. Oaklawn Jockey Club, 86 F.Supp. 1006, 1016 (W.D.Ark. 1949), aff'd, 183 F.2d 440 (8th Cir. 1950), or that it did not authorize state officials to control the management of the business or to dictate who should be served, Williams v. Howard Johnson's Restaurant, 268 F.2d 845, 847–848 (4th

Cir. 1959); Slack v. Atlantic White Tower System Inc., 181 F.Supp. 124, 129 (D.Md.), aff'd, 284 F.2d 746 (4th Cir. 1960).; Simkins v. Moses H. Cone Memorial Hospital, 211 F.Supp. 628, 636–637 (M.D.N.C.1962), rev'd on other grounds, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Wood v. Hogan, 215 F.Supp. 53, 57–58 (W.D.Va.1963) (distinguishing between licenses used as a means of regulating a business and licenses for mere tax purposes).

9. For cogent objections to findings of state action based upon the bare fact of licensing alone, absent such further consideration of the extent of state involvement in the challenged activity and the public character of the enterprise involved, see Lewis, The Sit-In Cases: Great Expectations, in The Supreme Court Review 1963, at 101, 116–118 (P. Kurland ed. 1963), and P. Freund, On Law and Justice 17–18 (1968).

10. Crowley v. Christensen, 137 U.S. 86, 91, 11 S.Ct. 13, 34 L.Ed. 620 (1890); Lewis v. City of Grand Rapids, 356 F.2d 276, 286 (6th Cir. 1966); Wager v. State Liquor Authority, 4 N.Y.2d 465, 176 N.Y.S. 2d 311, 312, 151 N.E.2d 869 (1958); Rios v. State Liquor Authority, 32 A.D. 2d 995, 302 N.Y.S.2d 79, 81 (3d Dep't 1969); Belden v. State Liquor Authority, 30 A.D.2d 1045, 294 N.Y.S.2d 849, 851 (4th Dep't 1968).; Marks v. Bruckman, 170 Misc. 709, 9 N.Y.S.2d 947, 949 (Sup. Ct.1939).

selling liquor to its citizens, e.g., 47 Penna. Stats. Ann. §§ 1–104, 2–207, 2–208, 3–301, 3–305 (1969), is unquestioned.[11] While state regulation of traffic in liquor is of course subject to certain limits imposed by the Due Process and Equal Protection clauses of the Fourteenth Amendment,[12] as well as by the Commerce Clause,[13] nevertheless the state's regulatory power in this area is far broader than in the case of an ordinary lawful business essential to the conduct of human affairs.[14] As the New York Court of Appeals stated in Joseph E. Seagram & Sons, Inc. v. Hostetter, 16 N.Y.2d 47, 262 N.Y.S.2d 75 at 79, 209 N. E.2d 701 at 704:

> "A long history of regulation, control, price fixing, place of time and sale setting, and outright extinction lies behind the liquor business in this country since Colonial times, and it is too late today to suggest that the rights of those who choose to engage in it are on a constitutional or legal parity with the rights of people who trade in bicycles, or cosmetics, or furniture." [15]

It is in this context that the State of New York's relationship to McSorleys' as a liquor licensee must be examined.

Section 2 of the Alcoholic Beverage Control Law (McKinney's Consol.Laws, c. 3–B, 1970) ("ABC Law") sets forth the state policy and purpose underlying liquor regulation in New York:

> "It is hereby declared as the policy of the state that it is necessary to regulate and control the manufacture, sale and distribution within the state of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to law. It is hereby declared that such policy will best be carried out by empowering the liquor authority of the state to determine whether public convenience and advantage will be promoted by the issuance of licenses to traffic in alcoholic beverages, the increase or decrease in the number thereof and the location of premises licensed thereby, subject only to the right of judicial review hereinafter provided for. It is the purpose of this chapter to carry out that policy in the public interest. The restrictions, regulations and provisions contained in this chapter are enacted by the legislature for the protection, health, welfare and safety of the people of the state."

Section 17 of the law grants to the State Liquor Authority ("SLA") power to issue, revoke, cancel or suspend for cause any of the 36-odd classes of licenses and permits provided for in the law (see §§ 50, 58, 60, 75 and 90); to limit in its discretion the number of licenses of each class—except hotel and restaurant licenses for on-premises consumption (see § 64(1), (5))—to be issued within the state; to inspect any premises where alcoholic beverages are manufactured or sold; to hold hearings, subpoena witnesses for examination under oath, and require production of any books or papers

---

11. Crowley v. Christensen, 137 U.S. at 91, 11 S.Ct. 13; Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 330–331, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); Joseph E. Seagram & Sons v. Hostetter, 16 N.Y.2d 47, 56, 262 N.Y.S. 2d 75, 79, 209 N.E.2d 701 (1965), aff'd, 384 U.S. 35, 42, 86 S.Ct. 1254, 16 L.Ed. 2d 336 (1966).

12. Parks v. Allen, 409 F.2d 210, 211 (5th Cir. 1969); Atlanta Bowling Center v. Allen, 389 F.2d 713, 715–716 (5th Cir. 1968); Mayhue v. City of Plantation, 375 F.2d 447 (5th Cir. 1967); Hornsby v. Allen, 330 F.2d 55 (5th Cir. 1964); Lewis v. City of Grand Rapids, *supra.*

13. Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964).

14. Glicker v. Michigan Liquor Control Commission, 160 F.2d 96, 101 (6th Cir. 1947); Lewis v. City of Grand Rapids, 356 F.2d at 286; Clore Restaurant v. Payne, 72 F.Supp. 677, 681 (D.C.1947).

15. Or as Justice Frankfurter put it in Goesaert v. Cleary, 335 U.S. 464, 465, 69 S.Ct. 198, 199, 93 L.Ed. 163 (1948).: "The Fourteenth Amendment did not tear history up by the roots, and the regulation of the liquor traffic is one of the oldest and most untrammeled of legislative powers."

relevant to its inquiry; and to prohibit the sale of alcoholic beverages, without prior notice, in time of public emergency.

Defendant McSorleys' is the holder of a retail beer license for on-premises consumption issued under § 55 of the Law. As such it is subject to a wide variety of provisions affecting the operation of its business. At the most elementary level, the personal qualifications of liquor licensees are subject to SLA review. The issuance of a license is a privilege afforded only to those of "high standing and character," Belden v. State Liquor Authority, 294 N.Y.S.2d at 851; Rios v. State Liquor Authority, 302 N.Y.S.2d at 81, and since license renewals are judged by the same standards applied to applications for new licenses, Wager v. State Liquor Authority, 4 N.Y.2d at 468, 176 N.Y.S.2d at 312, 151 N.E.2d at 870; Farina v. State Liquor Authority, 20 N.Y.2d 484, 491, 285 N.Y.S.2d 44, 49, 231 N.E.2d 748 (1967), a licensee may be deprived of the right to operate his business if the SLA determines that he has demonstrated sufficiently undesirable propensities. See SLA Rule 53.1(n) (McKinney App. 1970). Review of the SLA's exercise of discretion in refusing to issue or renew a license, moreover, is limited to the question whether its action was arbitrary and capricious. Wager v. State Liquor Authority, *supra;* Farina v. State Liquor Authority, *supra.* Similarly a license may be revoked, cancelled or suspended pursuant to § 118 for any of the multitude of causes listed in Rule 53.1, with review only slightly less limited than in the case of refusals to issue or renew. Farina v. State Liquor

Authority, *supra.* We do not believe that the Authority's revocation or refusal to renew a license because of the licensee's discrimination in the exercise of the rights granted would be set aside as arbitrary or capricious.

In this respect the case before us is distinguishable from Coleman v. Wagner College, 429 F.2d 1120 (2d Cir., June 22, 1970), where the court, in refusing to find state action on the record before it, noted that the state had not reserved the power to approve or disapprove disciplinary regulations adopted by private colleges pursuant to § 6450 of the State Education Law,[16] McKinney's Consol.Laws. c. 16. Here the SLA is granted broad authority to revoke or refuse a license for reasons deemed by it to serve the "public convenience and advantage," which could include the prevention of unjustified discrimination in the exercise of the rights granted.

Besides limiting liquor licenses to persons meeting certain standards of character and behavior, the law imposes restrictive physical standards on premises licensed for the sale and consumption of alcoholic beverages. Section 100(4) limits the number of bars allowed in any licensed premises; § 106(7), subject to the detailed provisions of Part 83 of the SLA Rules, forbids the display of signs either inside or outside licensed premises without permission of the Authority; and Part 47 of the Authority's Rules, with exceptions set forth therein, prohibits physical changes or alterations in licensed premises except with written permission from the Authority and payment of a fee for any alteration deemed "substantial." See Rule 47.6.[17]

---

16. The case was remanded for a hearing on the question whether the application of § 6450 by the officials charged with ·its administration, or the understanding on the part of the college administrators of the intent of the provision, might reveal "significant state intervention in the area of campus discipline" above and beyond the bare words of the section. 429 F.2d at 1125. Unaccountably, neither the majority nor concurring opinions in the case discuss Reitman v. Mulkey, 387

U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), where such investigation was not thought necessary.

17. "No alterations to a licensed premises other than as specified in the exceptions hereto (see sec. 47.2 or 47.3), may be effected unless application has been made to and permission received from the Authority in writing and in each of the following instances which are deemed substantial alterations, the

Most relevant to our inquiry, however, are the numerous provisions of the law directly regulating various aspects of a liquor licensee's day-to-day operations. For example, §§ 65 and 82 prohibit sales to minors,[18] intoxicated persons, and habitual drunkards. Sections 105–a and 106(5), together with Rule 60.1, prescribe the hours during which alcoholic beverages may be sold and consumed on licensed premises. Section 100 2–a provides that no retailer of alcoholic beverages, except the holder of a grocery store beer license, shall employ any person under the age of 18 on licensed premises in any capacity requiring the handling of liquor. Section 102(2) forbids license holders to employ, in any capacity, any person who has been convicted of a felony or of any of a series of enumerated offenses and has not received either an executive pardon or the written approval of such employment from the SLA. Section 100(5) forbids retail licensees to sell alcoholic beverages on credit, and subsection (6) prohibits licensees from selling or purchasing alcoholic beverages by way of warehouse receipts, except as provided by Part 64 of the SLA Rules. Section 112 and Part 81 of the Rules set forth the terms and conditions of surety company bonds required of all licensees and permitees under the law. Section 17(8) gives the

SLA power to prescribe forms of "all reports which it deems necessary to be made by any licensee or permitee," and § 106(12) requires that retail licensees for on-premises consumption maintain on the premises precise records of daily purchases and sales, available for inspection by any authorized representative of the SLA.[19]

The effect of this pervasive regulatory scheme goes beyond the immediate and extensive control over the operation of the businesses of liquor licensees. In addition, the general restrictions with which the retail sale of alcohol is hedged about, and in particular the restrictions imposed upon applications for new licenses, operate to limit competition to a degree sufficient to render the issuance of a license a commercially valuable privilege granted by the state to the licensee. At one time, indeed, it was the affirmative policy of the State of New York to foster and protect a monopolistic position for liquor licensees, on the theory that high, stable liquor prices would encourage temperance. Note, The New York State Liquor Market: The Rocky Road to Competition, 54 Cornell L.Rev. 113, 114 (1968).

Although the state legislature in 1964 amended the Alcoholic Beverage Control Law to increase competition, the SLA is still granted broad powers with re-

application for permission to effect alterations must be accompanied by the appropriate fee as prescribed in section 47.5 hereof."

18. See also New York Penal Law § 260.20 (McKinney's Consol.Laws, c. 40, 1967).

19. Section 65, in addition to forbidding sales to minors, intoxicated persons and habitual drunkards, provides further that

"Neither such person so refusing to sell or deliver under this section nor his employer shall be liable in any civil or criminal action or for any fine or penalty based upon such refusal, except that such sale or delivery shall not be refused, withhold from or denied to any person *on account of race, creed, color or national origin*." (Emphasis added)

The absence of "sex" from the list italicised above is apparently only a reflec-

tion of its absence from the public accommodations provisions of other New York statutes, and again (see note 4 *supra*) no indication of an affirmative legislative intent to omit it in the case of premises licensed to sell alcoholic beverages. Cf. Ch. 292 [1945], New York Laws 672, amending this section by the addition of the phrase "or national origin" to conform it to a group of other statutes including the state Civil Rights Law. Furthermore the express statutory prohibition of specified types of discrimination does not sanction the practice of other types by the licensee. The present case must therefore stand independent of state legislative intent to prohibit sex discrimination in places of public accommodation. Indeed if the state had expressly sanctioned discrimination on the basis of sex, the case for state action would be ironclad.

spect to the issuance of licenses and the renewal and revocation of existing licenses. The standard applied by the Liquor Authority in passing upon applications for licenses under § 55 (on-premises beer licenses) is that set forth in § 2 of the law, which empowers the Authority to determine

"whether public convenience and advantage will be promoted by the issuance of licenses to traffic in alcoholic beverages, the increase or decrease in the number thereof and the location of premises licensed. * * * "

The Authority's exercise of this broad power as reviewed by state courts reveals a tendency, notwithstanding the 1964 amendments, to protect the economic interests of established licensees by renewing their licenses and by denying applications of new entrants, at least where existing licensees have made substantial investments and there has been no growth in community population or usage. Forman v. State Liquor Authority, 17 N.Y.2d 224, 270 N.Y.S.2d 401, 217 N.E.2d 129, on remand, 52 Misc.2d 641, 276 N.Y.S.2d 537 (Sup.Ct. 1966), rev'd, 28 A.D.2d 684, 282 N.Y.S. 2d 452 (2d Dep't 1967), aff'd, 21 N.Y.2d 984, 290 N.Y.S.2d 909, 238 N.E.2d 215 (1968); William H. Van Vleck, Inc. v. Klein, 50 Misc.2d 622, 271 N.Y.S.2d 64, 67, 69 (Sup.Ct.1966).

Thus, while it can no longer be said that liquor licensees in New York enjoy the benefits of a state-created monopoly, cf. the bus franchise involved in Boman v. Birmingham Transit Company, 280 F.2d 531 (5th Cir. 1960), 292 F.2d 4 (5th Cir. 1961); Karst & Van Alstyne, Comment: Sit-Ins and State Action, 14 Stan.L.Rev. 762, 775 (1962), the licensing practices of the SLA still operate to restrict competition between vendors of alcoholic beverages, thus conferring on license holders a significant state-derived economic benefit approximating the state support provided by the lease involved in Burton v. Wilmington Parking Authority, 365 U.S. 715, 724, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Other significant factors revealing state involvement appear in the present case. Each year McSorleys' is required by § 109 of the ABC Law to apply for renewal of its license. In addition to the information required to be furnished annually in support of these applications for renewal, it is also required to maintain detailed records, and its premises may be visited and inspected from time to time by ABC inspectors pursuant to § 17. Since McSorleys' has pursued a uniform policy over the last 115 years of refusing service to women, it would be rather extraordinary if the SLA had not become aware of its discriminatory policy. Indeed the state has issued a renewal of its current license, to go into effect on June 30, 1970, with knowledge of the discrimination forming the basis of the present suit. The state's apparent acquiescence is a factor that has been considered elsewhere in resolving the issue of state action. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Burton v. Wilmington Parking Authority, *supra*, 365 U.S. at 725, 81 S.Ct. 856.

Another criterion suggested for determining whether state involvement is to be deemed significant, whether the conduct may reasonably be viewed "as authorized by an agency of the state," see concurring opinion of Judge Friendly in Coleman v. Wagner College, *supra* (429 F.2d at 1127), commenting on Burton v. Wilmington Parking Authority, is also met here. McSorleys' prominently displays its state license to be seen by all visitors pursuant to § 114 of the ABC Law, which provides:

"Before commencing or doing any business for the time for which a license has been issued said license shall be enclosed in a suitable wood or metal frame having a clear glass space and a substantial wood or metal back so that the whole of said license may be seen therein, and shall be posted up and at all times displayed in a conspicuous place in the room where such business is carried on, so that all per-

sons visiting such place may readily see the same."

As we noted earlier in discussing the purpose of the state action limitation upon federal remedies under § 1983, it is relevant to a finding of "state action" *vel non* to consider the nature of the alleged sphere of privacy and autonomy in need of protection from federal intervention. The question in a case like that before us is not whether *any* state involvement can be found; manifestly it can. The question is whether the state involvement that is undeniably present is involvement of a kind and extent that is "significant" in terms of present-day state action doctrine. One of the facts to be sifted and circumstances to be weighed in determining the true significance of state involvement, Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), is surely the context of that involvement, the nature of the activity in which state sanctions or control or support are felt.

Defendant's policy of refusing service to women hardly represents an exercise of individual choice in the use of private property. McSorleys' is open to the public. Any one of the male sex who is over 18 and neither drunk nor disorderly may enter and purchase a drink. The success of the business depends, in fact, upon large numbers of individuals doing precisely that, and a continuing invitation is extended to as many males as can, consistent with fire regulations, be served on the premises. In this significant respect defendant differs from a private men's club, which does not purport, and is not required, to serve the public.[20]

Furthermore, it is meaningless to conceive of McSorleys' policy as in any sense an expression of personal preference on the part of a property owner. As the title of this action indicates, McSorleys' is corporately owned. Its decision to exclude women is a business decision. The proverbial right of a homeowner to choose whom he shall invite to dinner is in no sense bound up in McSorleys' freedom to exclude women. We deal with property voluntarily serving the public, devoted to a business in which volume of patronage is essential to commercial success. When a state licenses such an enterprise, in an area peculiarly subject to state regulation, pursuant to a statute imposing pervasive controls upon the conduct of the business, and under circumstances in which state licensing practices endow the license with a certain franchise value as well, the state's involvement in the operation of defendant's business, and hence by implication in the exclusionary practice under attack,[21] rises to the level of sig-

---

**20.** This distinction is reflected in the provisions of the Alcoholic Beverage Control Law, which regulate private-club licensees more loosely in certain respects than licensees whose premises are open to the public. Compare, for instance, Rule 47.7(d), prescribing those alterations in premises licensed under § 55 which are considered "substantial" and which require payment of a fee and written permission from the Authority, with § (f) of the same Rule, listing only three such types of alterations in the case of club licensees. Similarly all non-substantial alterations may be made by a club without securing the permission of the Authority, Rule 47.3(f), while an eating place beer licensee like McSorleys' must secure permission for all but certain excepted alterations, Rules 47.1, 47.3 (d).

License fees are half the retail on-premises amount for all clubs except luncheon and golf clubs, for which specific reduced rates are set. Section 66(4). Sales on credit, forbidden on the part of retail licensees generally, are permitted by club licensees to members and their guests, as well as by hotel licensees to registered guests and by off-premises wine licensees to duly organized churches, synagogues and other religious organizations. Section 100(5). And § 100(4) provides that temporary portable bars are permitted without payment of the usual additional fee in hotels, restaurants and clubs at functions "to which members of the general public are not admitted."

**21.** The state involvement in this case is sufficiently pervasive, and defendant's operations sufficiently unitary, to escape

nificance within the meaning of *Burton,* and requires McSorleys' to comply with the proscriptions of the Fourteenth Amendment "as certainly as though they were binding covenants written into the [license] itself." 365 U.S. at 726, 81 S.Ct. at 862.

### Discrimination

■ We turn to the question of whether defendant's practice of refusing service to women denies plaintiffs the equal protection of the laws. The answer turns on whether such discrimination is without foundation in reason. It is only irrational or arbitrary distinctions or classifications that are forbidden by the Fourteenth Amendment.

■ Although the difference between the sexes has been the source of more poetry and prose than almost any other phenomenon of life, discrimination based on sex will be tolerated under the Equal Protection Clause only if it bears a rational relation to a permissible purpose of the classification. For instance, in Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908), the Supreme Court took account of differences in physical structure, strength and endurance of women in upholding a state work-hour limitation for women only. In Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), home and family responsibilities were held to justify a jury duty exemption for women. Gruenwald v. Gardner, 390 F.2d 591 (2d Cir.), cert. denied sub nom. Gruenwald v. Cohen, 393 U.S. 982, 89 S.Ct. 456, 21 L.Ed.2d 445 (1968), upheld Social Security Act provisions favoring women in computation of benefits as reasonably related to the legislative objective of redressing the imbalance in economic opportunity and achievement between men and women. Conversely sex-based discriminations have been nullified when no persuasive difference between women and men could be offered to justify the difference in treatment. See, e. g., United States ex rel. Robinson v. York, 281 F.Supp. 8 (D.Conn.1968), invalidating a statute providing that women, but not men, could be committed to the state farm for indefinite terms exceeding the statutory maxima provided by the substantive statutes under which they were convicted; White v. Crook, 251 F.Supp. 401 (M.D.Ala.1966), declaring unconstitutional a statute excluding women from jury service; and Karczewski v. Baltimore & O.R.R., 274 F.Supp. 169 (N.D. Ill.1967), overturning the Indiana practice of denying women the right to sue for loss of consortium.[22]

■ In the case before us no difference between men and women, as potential customers of the defendant, has been offered as a rational basis for serving the one and not the other. It may be argued that the occasional preference of men for a haven to which they may retreat from the watchful eye of wives or womanhood in general to have a drink or pass a few hours in their own company, is justification enough; that the simple fact that women are not men justifies defendant's practice. The answer is that McSorleys' is a public place, not a private club, and that the preferences of certain of its patrons are no justification under the

the state action problems pointed out by Judge Friendly in Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968). There the court rejected the argument that state financial aid to Alfred University's Ceramics College could provide a basis for finding state action in the University's suspension of students from the University at large, and the argument that state regulation of educational standards within the University could be held to implicate the state generally in University policies toward demonstrations and discipline. Our case, like Burton v.

Wilmington Parking Authority, avoids the *Powe* part-whole problem, and involves the state far more extensively and intimately in the management of defendant's business than the limited state regulation of educational standards in *Powe* involved New York in the operation of Alfred University.

22. But see Miskunas v. Union Carbide Corp., 399 F.2d 847 (7th Cir. 1968), cert. denied, 393 U.S. 1066, 89 S.Ct. 718, 21 L.Ed.2d 709 (1969).

Equal Protection Clause. Such preferences, no matter how widely shared by defendant's male clientele, bear no rational relation to the suitability of women as customers of McSorleys'.

Nor do we find any merit in the argument that the presence of women in bars gives rise to "moral and social problems" against which McSorleys' can reasonably protect itself by excluding women from the premises. Social mores have not stood still since that argument was used in 1948 to convince a 6–3 majority of the Supreme Court that women might rationally be prohibited from working as bartenders unless they were wives or daughters of male owners of the premises. Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948). Quite apart from the differences between tending a bar and being served at one, we take judicial notice that the vast majority of bars and taverns do cater to both sexes. Without suggesting that chivalry is dead, we no longer hold to Shakespeare's immortal phrase "Frailty, thy name is woman." Outdated images of bars as dens of coarseness and iniquity and of women as peculiarly delicate and impressionable creatures in need of protection from the rough and tumble of unvarnished humanity [23] will no longer justify sexual separatism. At least to this extent woman's "emancipation" is recognized.

Finally, we note defendant's argument that it is unreasonable to impose upon it by judicial mandate the modifications in its sanitary facilities that would be required if it is directed to cater to women as well as men. As defendant's brief puts it, "Such collateral rules and regulations as would be necessary to make the overall mandate viable and workable, are most feasibly arranged by the enactment of laws by the legislature." Precisely such "collateral rules and regulations" have already been spelled out in the municipal codes dealing with health and sanitation, and are observed as a matter of course by the "vast majority of bars and taverns" mentioned above in which customers of both sexes are served. Defendant should have no difficulty in ascertaining exactly what the law requires of it in this area.

Plaintiffs' motion for summary judgment is granted.

It is so ordered.

23. See, e. g., the concurring opinion of Mr. Justice Bradley in Bradwell v. State of Illinois, 83 U.S. (16 Wall.) 130, 141–142, 21 L.Ed. 442 (1872), in which he stated: "Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband * * *. The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things, and cannot be based upon exceptional cases." This view, expressed on the dawn of Victorianism, hardly reflects the view expressed by Socrates to the effect that "Woman, once made equal to man, becometh his superior," or that of Tennyson: "The woman's cause is man's. They rise or sink together; dwarfed or godlike, bond or free; if she be small, slight-natured, miserable, how shall men grow?"